WISE, Judge.
 

 The appellant, Michael Brown, was convicted of murdering Betty Kirkpatrick during the course of committing a robbery and a burglary, offenses defined as capital by §§ 13A-5^0(a)(2) and 13A-5-40(a)(4), Ala.Code 1975. The jury, by a vote of 11 to 1, recommended that Brown be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Brown to death. This appeal followed.
 

 The State’s evidence tended to show the following. On October 12, 2001, Ricky Kirkpatrick and his wife discovered the body of his 65-year-old mother, Betty Kirkpatrick, in her mobile home in Huey-town. Her head was covered with a plastic bag and her throat had been cut. A knife and a paper towel were lying on her chest. Betty Kirkpatrick’s purse and her gold 1986 Ford Thunderbird automobile were missing. The forensic pathologist testified that Betty Kirkpatrick died of “asphyxia by strangulation and smothering.” (R. 431.) She also had bruises on her face and hands that, he said, were caused by blunt-force trauma.
 

 Several witnesses testified that they saw Brown driving a gold Thunderbird around the time of the murder. Alisha Spindlow testified that she saw Brown driving a gold Thunderbird and that he told her that he had killed Betty Kirkpatrick. Another individual, Kevin Clayton, testified that he saw Brown two days after the murder, that he was driving a gold Thunderbird, and that he told him that he got the car from a lady and the car would not be “hot” until the lady’s body was discovered. Kelly Watkins said that Brown was driving a gold Thunderbird around the time of the murder and that he told her that he had killed the lady who owned it. Watkins said that Brown told her that he had tried to choke the victim but she would not die so he cut her throat with a knife he got from the kitchen of her house.
 

 Forensic tests were also conducted on the bloodstains found on the paper towel discovered on Betty Kirkpatrick’s chest. Carl Mauterer, a forensic scientist with the Alabama Department of Forensic Sciences, testified that one stain was tested and found to be consistent with Brown’s blood — Brown could not be excluded as the donor.
 

 Detective Charles Hagler also testified that Brown told him that he went to Betty Kirkpatrick’s mobile home with three other individuals, Robert Smith, Kevin Clayton (who testified at Brown’s trial), and Moses Smiley, to rob Betty Kirkpatrick but that Robert Smith killed Kirkpatrick.
 

 The jury found Brown guilty of the two capital offenses charged in the indictment. A separate sentencing hearing was held. See § 13A-5-46, Ala.Code 1975. The jury recommended, by a vote of 11 to 1, that Brown be sentenced to death. A presen-tence report was then prepared as required by § 13A-5-47, Ala.Code 1975, and the circuit court held a separate sentencing hearing. After hearing testimony the circuit court sentenced Brown to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala.Code 1975.
 

 Standard of Review
 

 Brown has been sentenced to death. According to Rule 45A, Ala.R.App.P., this Court must review the record of the trial proceedings for “plain error.” Rule 45A, Ala.RApp.P., states:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under re
 
 *876
 
 view, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 In describing this standard of review, this Court has stated:
 

 “ ‘The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is “particularly egregious” and if it “seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” See
 
 Ex parte Price,
 
 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).’ ”
 

 Smith v. State,
 
 795 So.2d 788, 797-98 (Ala.Crim.App.2000), quoting
 
 Hall v. State,
 
 820 So.2d 113, 121-22 (Ala.Crim.App.1999).
 

 The majority of the issues raised on appeal were never brought to the circuit court’s attention. The “failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal.”
 
 Brooks v. State,
 
 973 So.2d 380, 387 (Ala.Crim.App.2006) (opinion on application for rehearing).
 

 Guilt-Phase Issues
 

 I.
 

 Brown argues that his trial counsel, Franklin Neumann, had a conflict of interest because Neumann had previously prosecuted a case against Brown and that previous conviction was used as an aggravating circumstance to support the death sentence in this case. He asserts that as a result of the conflict, Neumann’s performance was deficient.
 

 When this matter was brought to the circuit court’s attention, Brown stated on the record that he waived any conflict. Thus, Brown invited any error. “ ‘Invited error has been applied to death penalty cases. “An invited error is waived, unless it rises to the level of plain error.”
 
 Ex parte Bankhead,
 
 585 So.2d 112, 126 (Ala.1991).’”
 
 Scott v. State,
 
 937 So.2d 1065, 1075 (Ala.Crim.App.2005), quoting
 
 Adams v. State,
 
 955 So.2d 1037, 1050-1051 (Ala.Crim.App.2003). Accordingly, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 

 The following occurred when this matter was discussed at a pretrial hearing:
 

 “The Court: All right. This is CC-02-348, the
 
 State v. Michael Lee Brown.
 
 “[Defense counsel]: Judge, in fine tuning some things yesterday and last night, I ran across the aggravating circumstances that the State had provided us. And I happened to check the case numbers themselves, and I found one of the cases that was disposed of in Judge Pearson’s court in 1994. And I happened to look at it and I noticed that the prosecutor’s name on it was me. And so, I don’t — I didn’t remember Michael, and Michael had never brought it up to me, and I don’t know — I couldn’t remember whether I had ever discovered it earlier and talked about it with Michael, but at any rate, I informed [the
 
 *877
 
 prosecutors] this morning about it. And then I talked to Michael about it. And Michael has an independent recollection, which I don’t, that he recalls that I was not the prosecutor in the case; is that right, Michael?
 

 “The Defendant: Yes, sir.
 

 “[Defense counsel]: There was somebody he said was much younger than me. So anyway, I find that to be understandable since during that time while I was in Judge Pearson’s court, cases were assigned to a specific DA, and it would not be uncommon for someone else to handle someone else’s cases if it were a plea of guilty, which it was. He was represented by Ron Harris, and there was a plea of guilty on the case; isn’t that right, Michael?
 

 “The Defendant: Yes, sir; yes, sir.
 

 “[Defense counsel]: As I said, I did inform you of that and we discussed it this morning, and you told me that I wasn’t the prosecutor. And I said I don’t remember ever seeing you before until being appointed on this case. And so with that in mind, I am sure you don’t have any objection to continuing on the ease. We never dealt—
 

 “The Defendant: No, sir.
 

 “[Defense counsel]: And I just want to let the Court know that.
 

 “The Court: It appears from [defense counsel’s] lack of recollection and your independent recollection that there is no conflict, but if any conflicts exist, you, at this time, wish to waive that; is that correct?
 

 “The Defendant: Yes, ma’am.”
 

 (R. 6-7.)
 

 The record shows that in 1995 Brown pleaded guilty to attempted rape in the first degree. The case-action-summary sheet for that case lists another assistant district attorney as the prosecutor who was present at the guilty-plea hearing. (Supp. R. 72.) The court suspended Brown’s sentence and placed him on probation. In 1997, Brown was charged with violating the terms of his probation. The first page of the case-action-summary sheet for the probation-revocation proceeding lists Franklin Neumann as the assistant district attorney who prosecuted that violation. The remainder of the case-action-summary sheet for the probation revocation is not in the record; therefore, we do not know if Neumann was the assistant district attorney present during the hearing on Brown’s probation revocation. However, the record does show that Neu-mann did not prosecute Brown on the attempted-rape charge.
 

 In
 
 Brownlee v. State,
 
 666 So.2d 91 (Ala.Crim.App.1995), we addressed a similar issue and stated:
 

 “The appellant argues that one of his defense attorneys had a conflict of interest because that attorney was shown as the prosecutor on the case action summaries used to prove the appellant’s felony convictions in 1979 and 1980. He argues that that conflict rendered the appellant’s counsel ineffective.
 

 “During the appellant’s trial, defense counsel Burton Dunn noticed that he was named as the prosecutor in the cases resulting in the appellant’s prior felony convictions. This fact was brought to the attention of the trial court, and a conference was held between the judge, the state, and the defense. As a result of this conference, the appellant’s counsel stipulated to the prior convictions rather than have them presented to the jury. The thrust of the appellant’s claim is that because Burton Dunn was named as the prosecutor on the ease action summaries, he did not challenge the validity of these convictions. On the other hand, if Dunn was
 
 *878
 
 not the prosecutor and his name was on the case action summaries as an error, he should have challenged the proof of these convictions because this error made these documents defective.
 

 “ Tor counsel to be so ineffective in a conflict of interest context that an accused has been denied his Sixth Amendment right to counsel, counsel must be hampered by an “actual conflict of interest.”
 
 Ex parte Parker,
 
 704 S.W.2d 40, 41 (Tex.Ct.App.1986);
 
 Baty v. Balkcom,
 
 661 F.2d 391 (5th Cir.1981), cert. denied, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982).’
 

 “Browning v. State,
 
 607 So.2d 339, 342 (Ala.Crim.App.1992).
 

 “ ‘An actual conflict is a real conflict.
 
 McConico v. Alabama,
 
 919 F.2d 1543, 1546 (11th Cir.1990). “A possible, speculative or merely hypothetical conflict does not suffice.”
 
 Lightbourne v. Dugger,
 
 829 F.2d 1012, 1023 (11th Cir.1987), cert. denied, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). “An actual conflict of interest occurs when a defense attorney places himself in a situation ‘inherently conducive to divided loyalties.’
 
 Castillo [v. Estelle,
 
 504 F.2d 1243 (5th Cir.1974) ] at 1245.”
 
 Zuck v. Alabama,
 
 588 F.2d 436, 439 (5th Cir.), cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979);
 
 United States v. Carpenter,
 
 769 F.2d 258, 263 (5th Cir.1985). See also
 
 Smith v. White,
 
 815 F.2d 1401 (11th Cir.1987), cert. denied, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987).’
 

 “607 So.2d at 342.
 

 “ ‘To prove that an actual conflict adversely affected his counsel’s performance, a defendant must make a factual showing “that his counsel actively represented conflicting interests,”
 
 Cuyler v. Sullivan,
 
 446 U.S. [335] at 350, 100 S.Ct. [1708] at 1719 [64 L.Ed.2d 333 (1980) ], “ ‘ “and must demonstrate that the attorney ‘made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.’ ” ’ ”
 
 Barham v. United States,
 
 724 F.2d 1529, 1532 (11th Cir.) [quoting
 
 United States v. Mers,
 
 701 F.2d 1321, 1328 (11th Cir.1983) ], cert. denied, 467 U.S. 1230 [104 S.Ct. 2687, 81 L.Ed.2d 882] (1984).’
 

 “Molton v. State,
 
 651 So.2d 663 (Ala.Crim.App.1994).”
 

 666 So.2d at 95-96.
 

 In this case, there is no indication that counsel suffered from any conflict, much less an actual conflict of interest. Brown told the court that Neumann had not prosecuted him. There is no evidence indicating that counsel actively represented conflicting interests.
 
 [1]
 
 Accordingly, we find no error, much less plain error.
 

 II.
 

 Brown argues that the circuit court erred in denying his motion for $2,500 so that he could hire a mitigation expert to help gather mitigating evidence to present at the penalty phase of his trial. He asserts that he was denied a fair trial and a
 
 *879
 
 reliable sentencing hearing because that motion was denied.
 

 The record shows that, in January 2003, Brown filed his first motion for funds to hire a mitigation expert. In the motion Brown stated that the expert was essential to discover mitigating evidence. That motion was denied; however, the court did grant Brown’s motions for funds to secure an investigator, a serologist, and an expert to test Brown’s IQ. In October 2003, Brown filed a motion to reconsider the denial of the motion for funds to hire a mitigation expert. In this motion Brown states that the expert could undercover problems from Brown’s childhood. That motion was denied. In June 2004, Brown again moved that the court reconsider the denial of his motion. In this motion Brown references the fact that Brown was abused as a child. At a pretrial hearing where this motion was discussed the following occurred:
 

 “[Defense counsel]: Judge, the motion pretty much speaks for itself, but I wanted to be clear for the record, especially with this being a capital case, that Dr. [Kimberly] Ackerson is qualified to be a mitigation expert. She is willing to look into Michael Lee’s past, specifically allegations that she came across when she was doing an intelligence test on Michael of child abuse that occurred in his past. Just for the Court’s record, I specifically mentioned some of those incidents for your consideration. Judge, her fee would not exceed $2,500, and if this was granted, it would require a continuance of the case of about five months’ time.
 

 “One incident that I have knowledge of that is not in this motion, is I have spoken with other family members, and there was — not only was there child abuse — and I should say that also specifically, his mother being beaten by his father in his presence as a child, but also his older brother beating on his mother.
 

 “Again, these are all matters that could be looked into by Dr. Ackerson as a mitigation expert, and she could give testimony as to what this behavior could do to Michael Lee Brown in her professional opinion.
 

 “The Court: Okay. Anything from the State?
 

 “[Prosecutor]: No, Your Honor.
 

 “The Court: Well, I am still not satisfied that this is — needs a threshold showing for this. And it’s — so I am going to deny the motion and get ready to proceed to trial.”
 

 (R. 7-8.)
 

 In
 
 Beckworth v. State,
 
 946 So.2d 490 (Ala.Crim.App.2005), we considered a similar issue and stated:
 

 “Beckworth filed an ex parte motion seeking funds to hire a mitigation specialist, stating he was entitled to present, and to have the sentencing jury consider, aspects of his background and character that might be mitigating. He argued that ‘a comprehensive investigation must be undertaken of Mr. Beck-worth’s entire life,’ including his educational, medical, and social history, and he requested $6,500 to secure the services of the Alabama Prison Project to complete this investigation. (C. 385-89.) At a hearing on pending motions, the trial court asked defense counsel to provide any specific legal authority that supported his request for funds for the mitigation expert. (3/18/02 hearing, R. 22.)
 

 “Defense counsel filed a memorandum of law supporting presentation of mitigation evidence. (C. 488-91.) In that motion, counsel cited
 
 Hodges v. State,
 
 856 So.2d 875 (Ala.Crim.App.2001),
 
 aff'd,
 
 856 So.2d 936 (Ala.2003), and other cases for the proposition that a difficult family
 
 *880
 
 history has been considered a mitigating circumstance in capital-murder cases. Counsel also included a list of possible mitigation evidence received in interviews of Beckworth and of Beckworth’s mother and ex-wife. Thereafter, the trial court denied the motion for funds, stating that the proposed mitigation could be adequately presented through the testimony of family members. (C. 492.) Defense counsel filed a motion seeking reconsideration of the trial court’s denial of the request for funds to hire a mitigation expert. (C. 505-33.) The record does not reflect that the trial court ruled on the motion for reconsideration.
 

 “Defendants may be eligible to receive funds to hire certain experts to facilitate the formulation and presentation of a defense.
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The funds, however, are not to be granted automatically upon request. Rather, the grant or denial of such funds is a matter for the trial court’s discretion and is based on the allegations in the request for funds to hire the expert.
 

 “ ‘Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense.’
 

 “Ex parte Moody,
 
 684 So.2d 114, 119 (Ala.1996).
 

 “In
 
 Hodges v. State,
 
 856 So.2d 875, 915 (Ala.Crim.App.2001), we examined several cases in which funds had been requested to hire experts.
 

 ‘“As the Alabama Supreme Court stated in
 
 Dobyne v. State,
 
 672 So.2d 1354 (Ala.1995):
 

 “ ‘ “[A] defendant, in order to be entitled to funds to pay for an expert, must show more than a mere possibility that he or she will receive useful assistance from the expert. Rather, the defendant must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial. In the past, Alabama decisions have been based upon whether the defendant made an adequate showing of a need for the requested expert.
 
 Dubose [v. State
 
 ], 662 So.2d [1189,] 1191 [ (Ala.1995) ]; see also,
 
 Smith v. State,
 
 623 So.2d 369 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993);
 
 McLeod v. State,
 
 581 So.2d 1144 (Ala.Cr.App.1990);
 
 Siebert v. State,
 
 562 So.2d 586 (Ala.Cr.App.1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990);
 
 Stewart v. State,
 
 562 So.2d 1365 (Ala.Cr.App.1989);
 
 McGahee v. State,
 
 554 So.2d 454 (Ala.Cr.App.), aff'd, 554 So.2d 473 (Ala.1989).
 

 [[Image here]]
 

 “ ‘ “As we stated in
 
 Dubose,
 
 a defendant seeking expert assistance must show a reasonable probability that the expert would aid in the defense and that the denial of an
 
 *881
 
 expert to assist at trial would result in a fundamentally unfair trial. Do-byne failed to make such a showing.
 
 Dubose
 
 involved ‘critical’ DNA evidence that directly linked Dubose to the crime. This Court held that Dubose had made an adequate showing of the need for the requested sei'vices of a DNA expert. Here, Dobyne requested funds to hire a neurologist to present evidence of mitigating circumstances at the penalty phase of the trial. While we agree that there can be a need for expert assistance at the penalty phase of a capital trial, Do-byne has not shown that the denial of funds to hire a neurologist resulted in unfairness to him.”
 

 ‘“672 So.2d at 1357-59. Hodges failed to show that his trial was fundamentally unfair because of the failure of the trial court to approve funds for experts. Therefore, the trial court correctly held that Hodges failed to meet his burden of showing that he was entitled to state funds.’
 

 “As was found in
 
 Hodges
 
 and in the cases cited therein, we find that Beck-worth did not establish that the mitigation specialist would have assisted his defense or that the denial of the funds would render his trial fundamentally unfair.
 
 See also Lee v. State,
 
 898 So.2d 790, 853 (Ala.Crim.App.2001)(‘Similarly, in this case, the appellant did not make a threshold showing that either of the requested experts would probably assist his defense and that the denial of funds to hire the experts would result in a fundamentally unfair trial. Rather, he simply speculated that the experts would assist his defense. Therefore, because the appellant did not make the required showing of need, the trial court did not abuse its discretion in denying his requests for expert assistance.’). Beckworth had argued to the trial court that a mitigation expert would have investigated his life history, including his father’s abuse of his mother and his siblings, his mother’s abandonment of the family, and the level of dysfunction in the family. The trial court correctly determined that all of this evidence was available from Beckworth and his family. Unlike
 
 Ake,
 
 which involved a request for a psychiatrist to prove an insanity defense, or
 
 D'iibose v. State,
 
 662 So.2d 1189 (Ala.1995), which involved a request for a DNA expert to challenge the foundation of the State’s case and to establish a critical element of the defense, Beck-worth sought expert assistance with evidence already known and available to him through his own knowledge and experience and through the testimony of his family members. He failed to establish that the requested expert was ‘absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense.’
 
 Ex parte Moody,
 
 684 So.2d at 119. The denial of the requested funds did not render Beckworth’s trial fundamentally unfair. Therefore, we find no merit to this portion of Beckworth’s claim; he is entitled to no relief.”
 

 946 So.2d at 502-04 (footnote omitted).
 

 As in
 
 Beckworth,
 
 the information in this case as to which counsel sought the assistance of a mitigation expert was information that could easily have been obtained from Brown and his family members. In fact Brown’s mother and stepsister testified at the penalty phase about Brown’s upbringing. Brown failed to show that the denial of the motion for funds for a mitigation expert rendered his trial fundamentally unfair. Accordingly, the circuit court did not err in denying Brown’s motions.
 

 
 *882
 
 III.
 

 Brown argues that the circuit court erred in denying his motion for access to possible impeachment evidence to which he states he was entitled. Brown makes several arguments in support of this contention. Most of the arguments consist of one sentence in Brown’s brief to this Court.
 

 A.
 

 Brown first argues that the circuit court erred in denying his motion to obtain his institutional records. Brown’s entire argument is the following: “[T]he trial court failed to grant defense counsel’s motion to obtain institutional records for purposes of obtaining mitigation evidence.” (Brown’s brief at page 93.)
 

 At a pretrial hearing where this motion was discussed, the following occurred:
 

 “[Defense counsel]: The next motion is for motion for discovery of institutional records and files necessary to a fair trial.
 

 “The Court: What institution?
 

 “[Defense counsel]: For instance, when he’s at Jefferson County jail, Bessemer Division, I want to be able to comment on whether or not he’s been a model prisoner, whether or not he’s had problems while he’s been in there. I think it leads more to the sentencing part of this trial. I think jurors need to know that he has not been a problem, that his character, his demeanor, he’s had no violations, things of that nature, while he’s been incarcerated, that he doesn’t present a problem to the other inmates. “[Prosecutor]: My only response to that would be is that, I mean, I understand I’m the State of Alabama, but I have no authority over the sheriffs department or the Department of Corrections to make them produce any institutional records. I think the appropriate way to do that is with a subpoena to the appropriate agency asking for them documents because they would more than likely tell me that I would have to subpoena them.
 

 “[Defense counsel]: If I were to issue a subpoena there would not be an objection?
 

 “[Prosecutor]: Not from me.”
 

 (R. 17-18.) The record shows that this matter was resolved to defense counsel’s satisfaction. Thus, if any error occurred it was invited by defense counsel’s conduct. Accordingly, because the error was invited by counsel, in order to constitute reversible error the error must amount to plain error. See
 
 Scott v. State,
 
 supra.
 

 “As a general rule, the government need not disclose evidence available to the defense from other sources or evidence that the prosecution could not reasonably be imputed to have knowledge of or control over.
 
 Mills v. Singletary,
 
 63 F.3d 999 (11th Cir.1995), cert. denied, 517 U.S. 1214, 116 S.Ct. 1837, 134 L.Ed.2d 940 (1996);
 
 United States v. Moore, 25
 
 F.3d 563 (7th Cir.), cert. denied, 513 U.S. 939, 115 S.Ct. 341, 130 L.Ed.2d 297 (1994).”
 

 Hardy v. State,
 
 804 So.2d 247, 286 (Ala.Crim.App.1999). Defense counsel could have obtained these records by having a subpoena issued to the custodian of records at the Jefferson County jail and the Alabama Department of Corrections; he apparently did not do so. Accordingly, we find no plain error here.
 

 B.
 

 Brown next argues that the circuit court erred in denying his motion for the State to disclose any “known mitigating evidence.” (Brown’s brief at page 93.) At
 
 *883
 
 a hearing at which this motion was discussed, the following occurred:
 

 “The Court: If you want records from probation, if you want records from [the Department of Corrections], make an attempt to get them. If you have trouble getting them, let me know, and I will intervene. If you go forth in getting the information that you intend to use in the penalty phase as a mitigating circumstance, then I would order that, you know, you make them aware of it.
 

 “[Prosecutor]: Yes, ma’am. I have already provided them notice that at the— provided a copy of the notice of aggravating circumstances or what are the aggravating circumstances, the prior history, and made them aware that I intend to use his convictions for the purpose of aggravation.
 

 “As far as mitigation. I don’t have any mitigation in my file. If I did have some, I would turn it over as soon as I had it.
 

 “The Court: All right.”
 

 (R. 29-30.) There is no indication that the State was in possession of mitigating evidence and failed to disclose that evidence to Brown. Thus, we find no plain error.
 

 C.
 

 Brown further argues that the circuit court erred in denying his motion to disclose the criminal histories of several State witnesses.
 

 “We have held in Alabama in a number of cases that a defendant is not entitled to the general disclosure of the criminal records of the state’s witnesses. See, e.g.,
 
 Davis v. State,
 
 554 So.2d 1094 (Ala.Crim.App.1984), aff'd, 554 So.2d 1111 (Ala.1989), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991);
 
 Wright v. State,
 
 424 So.2d 684 (Ala.Crim.App.1982) (no absolute right of disclosure of criminal records of state’s witnesses);
 
 Mardis v. State,
 
 423 So.2d 331 (Ala.Crim.App.1982);
 
 Mack v. State,
 
 375 So.2d 476 (Ala.Crim.App.1978), aff'd, 375 So.2d 504 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1134 [ (1980) ]. We have also held that the trial court’s refusal to order the prosecution, pursuant to a defendant’s discovery motion, to provide the criminal record of each expected witness for the state was not a violation of
 
 Brady
 
 and its progeny.
 
 Davis v. State,
 
 554 So.2d at 1100.”
 

 Hardy v. State,
 
 804 So.2d at 286. In Alabama, a criminal defendant is not entitled to discover the criminal histories of the State’s witnesses. Thus, there was no error.
 

 D.
 

 Brown further argues that he was entitled to disclosure of the juvenile records of the State witnesses. The following occurred at a pretrial hearing concerning this motion:
 

 “[Defense counsel]: Judge, it is in my motion, but in response to that ... the
 
 Davis [v. Alaska,
 
 415 U.S. 308 (1974) ] case, the Supreme Court of the United States, defendant’s right to probe into the influence of possible bias of a prosecution witness outweighs the State’s interest protecting the confidentiality of the witness’s juvenile court record.
 

 “[Prosecutor]: I think in the
 
 Davis
 
 case if I’m not mistaken, the juvenile who testified, at the time he testified, he was on probation. And I think that the counsel in that case will allow — the ruling was that he should have been allowed to question him about the terms of his probation to see whether or not he was under any undue influence by the State.
 

 “I would have no objection to, as these witnesses testified, to take them outside
 
 *884
 
 the presence of the jury and ask them: Are you on juvenile probation, and go from there. As far as I know, none of the other witnesses we will call — none of the witnesses we expect to call are on juvenile probation. I don’t think any of them are juveniles. But we can ask them that as they testify. But I think that was the whole thing of
 
 Davis.
 

 “The Court: Okay. Well, I am going to reserve ruling on that. If at the time anybody shows they have any juvenile record, I will look at it, something in camera, and see if there is any — I suppose — any sort of, I guess — or maybe I’m reading something into this that isn’t there. Any kind of deal cut before—
 

 “[Defense counsel]: That would be a part of it, but also just ... just a general attack on the credibility of the witness.
 

 “[Prosecutor]: I don’t think
 
 Davis
 
 went that far, but [the judge] may need to look at it.
 

 “The Court: I will look at the
 
 Davis
 
 case, and I will reserve ruling on that before any juvenile act will be released. It will be subject to an in camera inspection by the Court.”
 

 (R. 15-16.)
 

 “The United States Supreme Court in
 
 Davis v. Alaska,
 
 415 U.S. 308 (1974), held that a witness’s juvenile record is not admissible for purposes of general impeachment, but may be relevant to show bias. In
 
 Davis,
 
 the appellant was on probation for a juvenile offense at the time of his testimony. The United States Supreme Court held that his juvenile probationary status, at the time of trial, was relevant to show bias and was admissible. See
 
 Smith v. State,
 
 795 So.2d 788 (Ala.Crim.App.2000).”
 

 Belisle v. State,
 
 11 So.3d 256, 276 (Ala.Crim.App.2007).
 

 Here, the above quote from the record shows that the circuit court did not deny Brown’s motion. The circuit court complied with the United States Supreme Court’s holding in
 
 Davis v. Alaska,
 
 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and allowed the defense access to any juvenile records that would show bias on the part of any of the state witnesses. Therefore, we find no error.
 

 IV.
 

 Brown next argues that the circuit court made “numerous erroneous rulings” that denied him his constitutional right to a fair trial.
 

 A.
 

 First, Brown argues that the court erred in not excluding Betty Kirkpatrick’s family from the courtroom.
 
 [2]
 
 He makes a one sentence argument in support of this contention: “[T]he trial court should have excluded the victim’s family members — who were also state witnesses against Mr. Brown — from the courtroom during the trial.” (Brown’s brief at page 92.)
 

 Section 15-14-56(a), Ala.Code 1975, provides:
 

 “Whenever a victim is unable to attend such trial or hearing or any portion thereof by reason of death ..., the victim’s family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article.”
 

 Rule 615, Ala.R.Evid., further states:
 

 “At the request of a party the court may order witnesses excluded so that
 
 *885
 
 they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of ... the representative of a victim who is unable to attend....”
 

 According to Rule 615, Ala.R.Evid., and statutory law, the circuit court did not err in allowing two of Betty Kirkpatrick’s family members to be present in the courtroom during trial.
 

 B.
 

 Second, Brown argues that the circuit court erred in denying his motion to have the prospective jurors complete juror questionnaires related to their qualifications for jury service. He asserts that voir dire is inadequate to uncover prejudices; therefore, he argues, it was essential that the jurors complete questionnaires. Brown points to no specific instance where the voir dire was not adequate to show any prejudices.
 

 The record shows that Brown moved to require the prospective jurors to complete juror questionnaires. Attached to the motion was a proposed questionnaire that was 10 pages in length and contained 40 questions. The circuit court initially reserved ruling on the motion but later denied it.
 

 In
 
 Hodges v. State,
 
 856 So.2d 875, 913 (Ala.Crim.App.2001), aff'd, 856 So.2d 936 (Ala.2003), we stated:
 

 “In
 
 Ex parte Land,
 
 678 So.2d 224, 242 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996), the Alabama Supreme Court held that the method of voir dire examination is within the discretion of the trial court and a trial court’s refusal to allow the use of [a] juror questionnaire is not an abuse of that discretion.”
 

 There is no indication that the circuit court abused its broad discretion in denying Brown’s request for juror questionnaires.
 

 C.
 

 Third, Brown argues that the circuit court erred in denying his motion to sequester the jury during the trial. Brown asserts that the error in not sequestering the jury was further compounded because, he says, the jurors were not properly instructed as to their obligations at each break and at the conclusion of each day of trial as required by Rule 19.3, Ala. R.Crim.P.
 
 [3]
 

 “Even in a capital case there is no requirement that a court sequester the jurors during the trial. The decision to grant or deny a motion to sequester the jury during trial is within the sound discretion of the trial court. See
 
 Centobie v. State,
 
 861 So.2d 1111 (Ala.Crim.App.2001).”
 

 Belisle v. State,
 
 11 So.3d at 279.
 

 Here, the circuit court on numerous occasions admonished the jurors to not dis
 
 *886
 
 cuss the case and to not read or listen to any news accounts concerning the case. Compared to other capital-murder trials this trial was not lengthy. The jury selection started on June 14, 2004, and the jury recommended a sentence of death on June 17, 2004. The record clearly shows that the jury was well aware of its obligations.
 

 As we stated in
 
 Smith v. State,
 
 795 So.2d 788, 805 (Ala.Crim.App.2000), cert. denied, 795 So.2d 842 (Ala.), 534 U.S. 872, 122 S.Ct. 166, 151 L.Ed.2d 113 (2001):
 

 “The trial court did not give similar detailed instructions at each break in the court proceedings. To require a court to do so would be unduly burdensome, disruptive, and contrary to the clear wording of Rule 19.3(d). Indeed, Rule 19.3(d) does not require that a trial court give the admonitions at each court break. Indeed, Rule 19.3(d) does not state that these instructions must be given more than once in the trial. The record clearly reflects that the jurors were aware of their duties and obligations. There was no violation of Rule 19.3(d).”
 

 There was no violation of Rule 19.3, Ala. R.Crim.P., in this case.
 

 V.
 

 Brown argues that his conviction and death sentence must be set aside because there is no evidence in the record indicating that the venire was sworn, and absent affirmative evidence, he argues, the presumption is that the jury venire was not sworn. He argues that because there was no oath administered to the venire his conviction violates Rule 12.1(c)(2), Ala. R.Crim.P., and must be reversed.
 
 [4]
 

 This claim, however, is refuted by the record. Before voir dire began, the following occurred:
 

 “The Court: All right. Ladies and gentlemen, I have got just a few questions that I would like to ask, and then I am going to allow the attorneys to ask some questions of you. And I will say that some of these questions — well, all of these questions, there is no right or wrong answer. It is how you feel, and it is important.
 
 This morning when you were sivom in as jurors by Judge Parsons, you said that you would make true answers to all questions propounded of you by the Court.”
 

 (R. 37) (emphasis added).
 

 Also, the case-action-summary sheet shows that Brown’s jury was sworn. It states: “Defendant being in open court with counsel and the State of Alabama by its assistant district attorney. Jury duly selected and sworn.” (C.R. 209.) Accordingly, Brown is due no relief on this claim.
 

 VI.
 

 Brown next argues that the circuit court committed several errors during jury selection which denied him a fair and impartial trial.
 

 A.
 

 First, Brown argues that the circuit court failed to remove several jurors for cause. We note that it appears that the majority of the challenged jurors did not sit on Brown’s jury; therefore, any
 
 *887
 
 error as to the failure to remove these jurors was at most harmless. As we stated in
 
 Calhoun v. State,
 
 932 So.2d 923 (Ala.Crim.App.2005), cert. denied, 548 U.S. 926, 126 S.Ct. 2984, 165 L.Ed.2d 990 (2006):
 

 “The Alabama Supreme Court in
 
 Bethea v. Springhill Memorial Hospital,
 
 833 So.2d 1 (Ala.2002), returned to the harmless-error analysis when reviewing a circuit court’s refusal to remove a prospective juror for cause. The Supreme Court stated:
 

 “ ‘The application of a “harmless-error” analysis to a trial court’s refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
 

 “ ‘ “The appellant was convicted of the crime of murder in the second degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the jury was formed the defendant had not exhausted his right to peremptory challenges.”
 

 “
 
 ‘Turner v. State,
 
 160 Ala. 55, 57, 49 So. 304, 305 (1909). However, in
 
 Swain v. Alabama,
 
 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds,
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that “[t]he denial or impairment of the right is reversible error
 
 without a shoiving of prejudice.”
 
 (Emphasis added [in
 
 Bethea\.)
 
 Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning. See
 
 Dixon v. Hardey,
 
 591 So.2d 3 (Ala.1991);
 
 Knop v. McCain,
 
 561 So.2d 229 (Ala.1989);
 
 Ex parte Rutledge,
 
 523 So.2d 1118 (Ala.1988);
 
 Ex parte Beam,
 
 512 So.2d 723 (Ala.1987);
 
 Uptain v. State,
 
 534 So.2d 686, 688 (Ala.Crim.App.1988) (quoting
 
 Swain
 
 and citing
 
 Beam
 
 and Rutledge);
 
 Mason v. State,
 
 536 So.2d 127, 129 (Ala.Crim.App.1988) (quoting
 
 Uptain).
 

 “
 
 ‘...
 
 [Tjhis Court has returned to the “harmless-error” analysis articulated in the
 
 Ross v. Oklahoma,
 
 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and
 
 [United States
 
 v.]
 
 Martinez-Salazar,
 
 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an “impartial” jury, see Ala. Const.1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.
 

 “ ‘In this instance, even if the Be-theas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis.’
 

 “833 So.2d at 6-7 (footnotes omitted). See also
 
 Dailey v. State,
 
 828 So.2d 340 (Ala.2001). As was the case in
 
 Bethea,
 
 Calhoun offers no evidence that the jury
 
 *888
 
 ultimately impaneled was biased; therefore, if error occurred it was harmless.”
 

 932 So.2d at 944-45 (footnote omitted). See also
 
 Belisle v. State,
 
 supra. Cf.
 
 General Motors Corp. v. Jernigan,
 
 883 So.2d 646 (Ala.2003) (harmless-error analysis does not apply when the circuit court erroneously denied five challenges for cause).
 

 Brown argues that the circuit court erred in failing to grant his challenge for cause of prospective juror E.V. because, he argues, E.V.’s relationship to an employee in the Jefferson County district attorney’s office made it impossible for him to be impartial.
 
 [5]
 
 During voir dire examination, prospective juror E.V. stated that his brother-in-law was a prosecutor in the Jefferson County district attorney’s office.
 

 Initially, we note that the record does not disclose that Brown moved that this juror be excused for cause. Therefore, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
 

 The record fails to show that E.V.’s brother-in-law had any connection to Brown’s case. In
 
 McGahee v. State,
 
 885 So.2d 191, 213 (Ala.Crim.App.2003), cert. denied, 885 So.2d 230 (Ala.2004), we stated the following concerning a similar issue: “Veniremember H.O. stated that he was the father-in-law of a prosecutor in the district attorney’s office. That attorney was not involved in McGahee’s prosecution, and Alabama law did not require that H.O. be excused on that ground. § 12-16-150(4), Ala.Code 1975.” Accordingly, we find no plain error in the circuit court’s failure to sua sponte remove prospective juror E.V. for cause.
 

 Brown also argues that the circuit court erred in not removing prospective jurors W.C. and C.D. because, he asserts, they expressed their preference for the death penalty, and they were biased in favor of the death penalty. Brown did not move that these jurors be removed for cause; therefore, we are limited to determining whether there is plain error. See Rule 45A, Ala.R.App.P.
 

 “ ‘ “[Wjhether a prospective juror in a capital murder case is properly excluded based on the juror’s views concerning the death penalty involves a question of fact. Therefore, a proper review of this determination requires that we give great deference to the trial judge’s discretion, because the judge was present and capable of observing the potential jurors and their responses.”
 
 Price v. State,
 
 725 So.2d 1003, 1025 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), citing
 
 Wainwright v. Witt,
 
 [469 U.S. 412 (1985) ].
 

 “ ‘In
 
 Clemons v. State,
 
 720 So.2d 961 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), this court stated:
 

 “ ‘ “
 
 Witherspoon v. Illinois,
 
 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), set the early standard for a court’s exclusion for cause of venire-persons who oppose the death penalty. The Court in dicta in
 
 Wither-spoon
 
 limited exclusion for cause to those venirepersons who made it “unmistakably clear (1) that they would automatically vote against imposition of capital punishment ... or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant’s guilt.”
 
 Id.
 
 [at] 522-23 n. 21, 88 S.Ct. at 1777 n. 21. Subsequently, in
 
 Wainwright v. Witt,
 
 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court clarified or modified its decision in
 
 Witherspoon
 
 by holding that the state may exclude venirepersons in capital cases whose views would
 
 *889
 
 “ ‘prevent or substantially impair the performance of [their] duties as a juror in accordance with his instruction and [their] oath.’”
 
 Id.,
 
 469 U.S. at 424, 105 S.Ct. at 852 (quoting
 
 Adams v. Texas,
 
 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The new
 
 Witt
 
 standard dispensed with the
 
 Witherspoon
 
 reference to “automatic” decision-making, and eliminated the requirement that a venireperson’s bias be proved with “unmistakable clarity.” 469 U.S. at 424, 105 S.Ct. at 852.’ ” ’ ”
 

 Turner v. State,
 
 924 So.2d 737, 753-54 (Ala.Crim.App.2002), cert. denied, 547 U.S. 1056, 126 S.Ct. 1653, 164 L.Ed.2d 399 (2006), quoting
 
 Burgess v. State,
 
 811 So.2d 557, 570 (Ala.Crim.App.1998).
 

 The voir dire examination reflects that prospective jurors W.C. and C.D. stated that they believed in the death penalty. Neither said, as Brown asserts, that they would automatically vote for death in this case. They said that they would consider it as a sentencing option. There was no error in the circuit court’s failure to sua sponte remove these jurors for cause.
 

 B.
 

 Brown next argues that the circuit court erred in allowing one juror, T.S., to be removed and another juror substituted in his place. Specifically, he argues that the court’s actions forced Brown to give up one peremptory strike and thereby prejudiced him.
 

 The record shows that immediately after the jury was struck juror T.S. approached the court and informed the court that on Thursday and Friday of that week he had a prearranged meeting in Hartford, Connecticut, with individuals from Ireland. T.S. asked the court to dismiss him from jury service. The following discussion then took place:
 

 “The Court: If you want to make him stay, if you want to put your last strike back on, it doesn’t matter to me. I mean, he’s — if y’all can come to some agreement on how to do it, I am all about it. If you can’t then—
 

 “[Prosecutor]: Do you want to go with 13 and have one alternate?
 

 “The Court: I don’t think I can.
 

 “[Defense counsel]: I don’t think you can either, Judge.
 

 “The Court: The statute requires 14—
 

 “[Prosecutor]: Okay.
 

 “The Court: — in a capital case.
 

 “[Defense counsel]: Do you mean putting our next to last strike back on, Judge?
 

 “The Court: Well, you tell me what’s—
 

 “[Prosecutor]: Well, your next to last would be — would become the alternate, I guess.
 

 “The Court: Do you want [P.H.] to go back on and — Number 237 to be your alternate? Is that what you want to do?
 

 “[Defense counsel]: No.
 

 “[Prosecutor]: Let’s go back through the whole thing and pick.
 

 “[Defense counsel]: Well, Judge, we would propose that we put our — I am sorry. What did you say?
 

 “The Court: Work with these last two. Either make Mr. — well, I don’t know their names. 250 was your last strike?
 

 “[Defense counsel]: Yes.
 

 “The Court: And 237 was your next to last strike?
 

 “[Defense counsel]: Uh-huh.
 

 “The Court: If you want to put — well, put 250 in as your last strike, and make 237 your alternate?
 

 “[Defense counsel]: That will be fíne, Judge.
 

 
 *890
 
 “The Court: Do you see what I’m saying?
 

 “[Defense counsel]: Yes, I do.
 
 That will be fine.
 
 We will do that.”
 

 (R. 205-07) (emphasis added). Defense counsel agreed to give up one of his peremptory strikes. Because Brown invited any possible error to constitute reversible error the error, must be plain. See
 
 Scott v. State,
 
 supra.
 

 In Alabama, a defendant is not entitled to any specific number of peremptory strikes so long as he is allowed at least 12 strikes in a capital case. Rule 18.4(f)(1), Ala.R.Crim.P., provides that there must be at least 36 prospective jurors when striking a jury in a capital case. Here, both the State and the defendant had 16 strikes. Accordingly, there was no violation of Alabama law. See
 
 Snyder v. State,
 
 893 So.2d 488, 520 (Ala.Crim.App.2003), cert. denied, 893 So.2d 563 (2004), cert. denied, 544 U.S. 1062, 125 S.Ct. 2512, 161 L.Ed.2d 1113 (2005). We find no error, much less, plain error.
 

 C.
 

 Fourth, Brown argues that the circuit court erred by removing prospective juror D.A. for cause without having a statutory basis for removing this juror.
 

 There was no objection made when the court excused D.A.; therefore, we review this claim for plain error. Rule 45A, Ala. R.App.P.
 

 During voir dire examination, the following occurred:
 

 “The Court: Good. Okay. You were telling me that you had a little bit of health problems maybe?
 

 “[D.A.]: Yes.
 

 “The Court: And you weren’t sure you wanted to serve?
 

 “[D.A.]: Yes, because I was sleeping and my eyes just close up on me. And I couldn’t help it, and I apologize.
 

 “The Court: Are you on some medication or something?
 

 “[D.A.]: Yes, I am.
 

 “The Court: Well, do you feel like that your medication would keep you from being able to be fully attentive and pay attention to everything that is going on?
 

 “[D.A.]: If I’m — today, I couldn’t, because I was asleep. My eyes just close up on me at times.
 

 “The Court: All right. I tell you what, you are free to go.... ”
 

 (R. 138-39.)
 

 At the time of Brown’s trial, § 12-16-63, Ala.Code 1975, provided:
 
 [6]
 

 “(a) The court, upon request of a prospective juror or on its own initiative, shall determine on the basis of information provided on the juror qualification form or interview with the prospective juror or other competent evidence whether the prospective juror should be excused from jury service. The jury commission shall enter this determination on the juror qualification form and the master list.
 

 “(b) A person who is not disqualified for jury service may be excused from jury service by the court only upon a showing of undue hardship, extreme inconvenience or public necessity, for a period the court deems necessary, at the conclusion of which the person may be directed to reappear for jury service in accordance with the court’s direction.”
 

 A circuit court had broad discretion in excusing jurors pursuant to the authority
 
 *891
 
 granted to it by former § 12-16-63, Ala. Code 1975. In
 
 McNair v. State,
 
 653 So.2d 320, 325 (Ala.Crim.App.1992), we stated:
 

 “A trial judge has ‘broad discretion’ in excusing venire members based on sickness or personal reasons,
 
 Nolen v. State,
 
 35 Ala.App. 249, 253, 45 So.2d 786, 790, cert. denied, 253 Ala. 565, 45 So.2d 792 (1950), but that decision must not be ‘capricious or arbitrary.’
 
 Blackmon v. State,
 
 246 Ala. 675, 679, 22 So.2d 29, 31 (1945). ‘It is generally held, however, that the court, in the exercise of sound discretion, may excuse a juror before he is sworn for any reason personal to such person which would make his service as a juror oppressive, or in fact for any reason which to the judge seems sufficient.’ 47 Am.Jur.2d
 
 Jury
 
 § 121 (1969) (footnotes omitted). ‘There is nothing in the insistence that it is not within the legal power of the court to excuse a juror for a cause regarded as sufficient by the court.’
 
 Evans v. State,
 
 209 Ala. 563, 565, 96 So. 923, 924 (1923). ‘[O]f necessity, great discretionary power in the selection of jurors to try cases must rest with the trial judge, and appellate courts will not interfere with this discretion, so long as no abuse of power is shown.’
 
 Baxley v. State,
 
 18 Ala.App. 277, 279, 90 So. 434, 435, cert. denied, 206 Ala. 698, 90 So. 925 (1921).”
 

 There is no indication that the circuit court abused its broad discretion in removing juror D.A. because of her medical condition. Accordingly, we find no error, much less plain error, in this case.
 

 D.
 

 Fifth, Brown argues that the circuit court erred in allowing the prospective jurors to be “death qualified.” He asserts that death-qualified jurors are more prone to convict and that the process of death qualifying disproportionately excludes minorities and women from the jury.
 

 In
 
 Davis v. State,
 
 718 So.2d 1148 (Ala.Crim.App.1995) (opinion on return to remand), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999), we stated:
 

 “A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in
 
 Wain-might v. Witt,
 
 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury.
 
 Williams v. State,
 
 710 So.2d 1276 (Ala.Cr.App.1996). See
 
 Lockhart v. McCree,
 
 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases.
 
 Id.; Williams; Haney v. State,
 
 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687(1993).”
 

 718 So.2d at 1157. There was no error in allowing the State to death qualify the prospective jurors.
 

 VII.
 

 Brown argues that the State used its peremptory strikes in a discriminatory manner to remove prospective jurors based on their race and gender in violation of
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (racial discrimination), and
 
 J.E.B. v. Alabama,
 
 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (gender discrimination).
 

 After the jury was struck, the State and defense counsel stated that they were satisfied with the jury selected. No
 
 Batson
 
 objection of any kind was made. Accordingly, we review this claim for plain error. Rule 45A, Ala.R.App.P.
 

 
 *892
 
 “To find plain error in the context of a
 
 Batson
 
 or
 
 J.E.B.
 
 violation, the record must supply an inference that the prosecutor was ‘engaged in the practice of purposeful discrimination.’
 
 Ex parte Watkins,
 
 509 So.2d 1074, 1076 (Ala.1987). Here, the record shows that the State struck nine males and nine females. The jury was composed of eight women and four men. There is no inference of purposeful discrimination in violation of
 
 J.E.B.
 
 Accordingly, we find no plain error.”
 

 Blackmon v. State,
 
 7 So.3d 397,
 
 425-26
 
 (Ala.Crim.App.2005) (opinion on application for rehearing).
 

 In this case, the supplemental record contains the venire list, which gives the demographic information on the prospective jurors. The strike list is also contained in the record. However, the juror numbers on the strike list do not correspond to the juror numbers on the venire list. When the jurors were struck the numbers were used and not the names. Thus, it is impossible to determine what specific jurors were struck and the race and gender of those who were struck. It is impossible to even determine the race or gender of the jurors who sat on Brown’s jury. Accordingly, we can find no plain error in this ease. Cf.
 
 Flowers v. State,
 
 799 So.2d 966 (Ala.Crim.App.1999), cert. denied, 534 U.S. 901, 122 S.Ct. 230, 151 L.Ed.2d 165 (2001) (no plain error because jury strike list did not contain the race and gender of jurors).
 

 VIII.
 

 Brown next argues that the circuit court erred in failing to ensure that a full and complete record was prepared. He asserts that significant portions of the record are missing; therefore, he argues, he is being denied his right to have his case fully reviewed by this Court. Brown’s entire argument consists of listing 33 pages in the record that reference off-the-record discussions. Brown is represented by different counsel on appeal than at trial.
 

 We have stated:
 

 “ ‘ “When, as here, a criminal defendant is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to mandate reversal. The wisdom of this rule is apparent. When a defendant is represented on appeal by the same attorney who defended him at trial, the court may properly require counsel to articulate the prejudice that may have resulted from the failure to record a portion of the proceedings. Indeed, counsel’s obligation to the court alone would seem to compel him to initiate such disclosure. The attorney, having been present at trial, should be expected to be aware of any errors or improprieties which may have occurred during the portion of the proceedings not recorded. But when a defendant is represented on appeal by counsel not involved at trial, counsel cannot reasonably be expected to show specific prejudice. To be sure, there may be some instances where it can readily be determined from the balance of the record whether an error has been made during the untran-scribed portion of the proceedings. Often, however, even the most careful consideration of the available transcript will not permit us to discern whether reversible error occurred while the proceedings were not being recorded. In such a case, to require new counsel to establish the irregularities that may have taken place would render illusory an appellant’s right to
 
 *893
 
 notice plain errors or defects, and render merely technical his right to an appeal.
 

 “ ‘ “We do not advocate a mechanistic approach to situations involving the absence of a complete transcript of the trial proceedings. We must, however, be able to conclude affirmatively that no substantial rights of the appellant have been adversely affected by the omissions of the transcript. When ... a substantial and significant portion of the record is missing, and the appellant is represented on appeal by counsel not involved at trial, such a conclusion is foreclosed
 

 Green v. State,
 
 796 So.2d 438, 439-40 (Ala.Crim.App.2001), quoting
 
 Ex parte Godbolt,
 
 546 So.2d 991, 997 (Ala.1987), quoting in turn
 
 United States v. Selva,
 
 559 F.2d 1303, 1305-06 (5th Cir.1977).
 

 We have reviewed each page cited by Brown in his brief. In each instance the record refers to a discussion or conference held outside the presence of the jury. However, it is clear that no major portions of the record are missing. In the overwhelming majority of the pages cited, the conversation after the discussion that was not transcribed continues on as if nothing occurred off the record. Indeed, in some instances it is clear that the court was involved in scheduling matters or that the off-the-record discussion was between defense counsel and the prosecution.
 

 As we stated in
 
 Wynn v. State,
 
 804 So.2d 1122, 1143-45 (Ala.Crim.App.2000), cert. denied, 804 So.2d 1152 (Ala.2001), cert. denied, 535 U.S. 972, 122 S.Ct. 1440, 152 L.Ed.2d 383 (2002):
 

 “[W]e note that it should have been apparent to the defense during the trial that the court reporter was not recording certain sidebars. In fact, during the hearing on the appellant’s motion for a new trial, trial counsel admitted, T do recall sidebars without a court reporter taking down the transcript. At least not — without my knowledge.’ (R. 1944.) Defense counsel could have easily reminded the trial court that it had granted his motion for full recordation of the proceedings and remedied the omissions at that time. Therefore, this error was invited by the appellant.
 

 [[Image here]]
 

 “... A review of the portions of the record before and after the unrecorded sidebars clearly indicates that the unrecorded sidebars pertained to general, administrative matters, such as notifying the trial court that an objection needed to be made outside of the hearing of the jury and discussing the timing of breaks, that did not affect the outcome of the trial. In fact, on several occasions after an unrecorded sidebar occurred, the trial court stated for the record the substance of what occurred during the sidebar. In addition, the actual objections and discussions about the objections are included in the record on appeal. Therefore, under the facts of this case, we conclude that the error that resulted from the failure to record certain sidebars was harmless.”
 

 As we did in
 
 Wynn,
 
 we conclude that if any error did occur it was at most harmless.
 

 IX.
 

 Brown argues that the circuit court erred in allowing Det. Charles Ha-gler to testify about a statement Brown made to police. Specifically, he argues that Det. Hagler should not have been allowed to testify because the audiotape recording of the statement was lost and because, he says, the State failed to prove that the statement was knowingly and voluntarily made.
 

 
 *894
 
 “It has long been the law that a confession is prima facie involuntary and inadmissible and that, before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a
 
 Miranda
 
 predicate.
 
 Jackson v. State,
 
 562 So.2d 1373, 1380 (Ala.Crim.App.1990). A two-pronged test is used to determine whether an accused’s statement is admissible. First, the trial court must determine whether the accused was informed of his
 
 Miranda
 
 rights before he made the statement. Second, the trial court must determine whether the accused voluntarily and knowingly waived his
 
 Miranda
 
 rights before making his statement.
 
 Holder v. State,
 
 584 So.2d 872, 878 (Ala.Crim.App.1991);
 
 Carpenter v. State,
 
 581 So.2d 1277, 1278 (Ala.Crim.App.1991).”
 

 Jones v. State,
 
 987 So.2d 1156, 1163-64 (Ala.Crim.App.2006).
 

 At the suppression hearing Det. Hagler testified that he spoke with Brown on October 18, 2001. He said that after police recovered the vehicle taken from Betty Kirkpatrick’s home he and Brown went to the location where the vehicle had been found. Brown was in the vehicle. Hagler said that while he was in the vehicle with Brown he read Brown his
 
 Miranda
 

 [7]
 

 rights, that Brown waived his rights, and that Brown signed a waiver-of-rights form. He said that he made an audiotape of the statement but that he lost the audiotape. Det. Hagler further stated that he did not coerce, threaten, or offer Brown any inducement in order to secure his statement. Brown told him, Det. Hagler said, that he went to Betty Kirkpatrick’s house with three other individuals to rob the victim but that he did not participate in her murder. The court then held a discussion concerning the missing audiotape and denied the motion to suppress the statement.
 

 The State could properly introduce the contents of Brown’s statement without producing the audiotape. As we stated in
 
 Hawkins v. State,
 
 443 So.2d 1312, 1314 (Ala.Crim.App.1983):
 

 “Here, the State could have proved the contents of Hawkins’ statement without the tape recording or the typewritten transcript. Any person who was present and heard the statement could have testified to its content.
 
 Gordon v. State,
 
 34 Ala.App. 278, 280, 41 So.2d 608, affirmed, 252 Ala. 492, 41 So.2d 610 (1949). The unavailability of a tape recording of a confession does not preclude the admission of the oral testimony of a witness to the inculpato-ry statement.
 
 Fleming v. State,
 
 57 Ala.App. 556, 329 So.2d 616 (1976). ‘If the accused makes an oral confession, and minutes later signs a written confession of somewhat similar content to the oral confession, there are two distinct confessions and neither the best evidence rule nor the parol evidence rule debars the State from proving either or both confessions.’ C. Gamble,
 
 McElroy’s Alabama Evidence,
 
 Section 200.19 (3rd ed.1977).”
 

 Moreover, there is no evidence indicating that Det. Hagler acted in bad faith in losing the audiotape. This Court in
 
 May v. State,
 
 710 So.2d 1362 (Ala.Crim.App. 1997), stated:
 

 “The Alabama Supreme Court, in
 
 Ex parte Gingo,
 
 605 So.2d 1237 (Ala.1992), adopted the United States Supreme Court’s position in
 
 Arizona v. Youngblood,,
 
 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), regarding the allegations that the state failed to preserve
 
 *895
 
 evidence potentially useful to the defense:
 

 “ ‘ “Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.”
 
 Youngblood,
 
 488 U.S. at 58, 109 S.Ct. at 337. “The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police’s knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.”
 
 Youngblood,
 
 488 U.S. at 57 (footnote), 109 S.Ct. at 337 (footnote), citing
 
 Napue v. Illinois,
 
 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).’
 

 “605 So.2d at 1240-41.
 
 Gingo
 
 additionally recognized that a defendant’s right to due process can be violated when the loss or destruction is of evidence so critical to the defense that its loss or destruction makes the trial fundamentally unfair.
 
 Id.
 
 (citing
 
 Youngblood,
 
 488 U.S. at 67, 109 S.Ct. at 342).
 

 “May has failed to establish that the loss or destruction of the bullet fragment and shell casing violated his right to due process under either theory recognized by Alabama law. May’s allegation that the evidence was lost or destroyed in bad faith is completely without support in the record. Additionally, May has failed to demonstrate that the evidence was critical to the defense’s case. The murder weapon was never recovered by the police. Even had the bullet fragment and the spent shell casing been subjected to ballistics tests, there was no weapon to which a ballistics test could conceivably match them. May’s theory that more than one weapon was used at the scene based on evidence of only one shell casing and more than one bullet could still be illustrated by the photographs of the crime scene.”
 

 710 So.2d at 1369-70.
 

 There was no showing that the loss of the audiotape of Brown’s statement violated his right to due process or rendered his trial fundamentally unfair. Det. Hagler testified concerning the contents of the statement, and the contents of the statement were consistent with Brown’s defense at trial. Defense counsel admitted in his opening statement that Brown told police that he went to Betty Kirkpatrick’s home to rob her but he did not participate in her murder. The loss of the audiotape did not render Brown’s trial fundamentally unfair. See
 
 May.
 
 Thus, the circuit court properly allowed Det. Hagler to testify about the contents of Brown’s statement after the State proved by a preponderance of the evidence that the statement was knowingly and voluntarily given. See
 
 McLeod v. State,
 
 718 So.2d 727 (Ala.1998).
 

 X.
 

 Brown next argues that the circuit court erred in allowing the introduction of highly prejudicial evidence, which, he argues, inflamed the passions and prejudices of the jury.
 

 A.
 

 First, Brown argues that the admission of the numerous photographs of the victim made during the autopsy and at the crime scene was unduly prejudicial and constitutes reversible error.
 

 “ ‘This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries.’
 
 Ferguson v. State,
 
 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ‘ “[A]u-topsy photographs depicting the charac
 
 *896
 
 ter and location of wounds on a victim’s body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.” ’
 
 Jackson v. State,
 
 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting
 
 Perkins v. State,
 
 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala.2002). ‘[Ajutopsy photographs depicting the internal views of wounds are likewise admissible.’
 
 Broadnax v. State,
 
 825 So.2d 134, 159 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001). See also
 
 Dabbs v. State,
 
 518 So.2d 825 (Ala.Crim.App.1987);
 
 Hamilton v. State,
 
 492 So.2d 331 (Ala.Crim.App.1986); Fi
 
 ke v. State,
 
 447 So.2d 850 (Ala.Crim.App.1983); and
 
 McKee v. State,
 
 33 Ala.App. 171, 31 So.2d 656 (1947) (all holding that photographs of internal injuries were properly admitted although they were gruesome).”
 

 Eggers v. State,
 
 914 So.2d 883, 915 (Ala.Crim.App.2004), cert. denied, 546 U.S. 1140, 126 S.Ct. 1143, 163 L.Ed.2d 1004 (2006). The photographs of the crime scene were also admissible. See
 
 White v. State,
 
 900 So.2d 1249 (Ala.Crim.App.2004). Thus, the circuit court committed no error in allowing the various photographs to be received into evidence.
 

 B.
 

 Second, Brown argues that the circuit court erred in allowing state witness Kevin Clayton to testify that Brown had admitted to killing Betty Kirkpatrick and that he believed Brown when he told him he had killed Kirkpatrick because Brown said “on the boss.” Brown argues that this statement implied that he had a gang affiliation and prejudiced him.
 

 There was no objection to this testimony; therefore, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
 

 The record shows that during Clayton’s testimony, he said that Brown told him that he had killed someone. Clayton said that at first he did not believe Brown but that Brown then said “on the boss,” and he believed him. The following then occurred:
 

 “[Prosecutor]: What did [Brown] say?
 

 “[Clayton]: On the boss.
 

 “[Prosecutor]: On the boss?
 

 “[Clayton]: Yes, sir.
 

 “[Prosecutor]: Judge, may be approach?
 

 “The Court: Yes.
 

 “[Prosecutor]: We may need to be heard outside the presence of the jury.”
 

 (R. 333.) The prosecution then questioned Clayton on voir dire as to the meaning of the phrase, “on the boss.” Clayton testified on voir dire that it was a gang expression that meant swearing that something was true. Back in the presence of the jury Clayton testified that “on the boss” meant to swear or take an oath. There was never any mention of any gang affiliation in the presence of the jury.
 

 Clayton testified concerning the circumstances surrounding Brown’s admission of guilt in Kirkpatrick’s murder. This testimony was properly allowed, and its admission did not constitute plain error.
 

 XI.
 

 Brown argues that the circuit court erroneously allowed DNA evidence to be admitted. Specifically, he argues that it was error to allow the DNA expert to testify that he could not exclude Brown as the source of the blood found on the paper towel recovered from Betty Kirkpatrick’s body.
 

 At the hearing on the admission of the DNA evidence there were no objections
 
 *897
 
 made to the admission of the evidence; therefore, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
 

 A.
 

 First, Brown argues that the DNA expert did not testify that population-frequency statistics for a mixed sample were reliable and accepted in the scientific community.
 

 Carl Mauterer, a forensic scientist with the Alabama Department of Forensic Sciences, testified that he conducted DNA tests on a paper towel, which contained two bloodstains. Mauterer testified about the statistical significance of the DNA samples. The following occurred:
 

 “[Prosecutor]: How are population-frequency statistics used to estimate the significance of a DNA test result?
 

 “[Mauterer]: Well, you can’t say with a hundred percent certainty that a particular profile that you see in an evidence stain came from a known individual. So, the first thing you do is once you check those profiles to see if they do match, you have to put some significance to that. So, what we do is we have reference data sets from African-Americans and Caucasians in Alabama. And we use those standard reference sets along with the standard statistical methods to calculate some significance of you reaching out into general population, what are the odds of you pulling someone out of that population that has that particular profile.
 

 “[Prosecutor]: What database did you use to make the statistical estimates in this case?
 

 “[Mauterer]: We used the Alabama database of African-Americans and Caucasians.
 

 “[Prosecutor]: Have your database results been compared to databases used in other states?
 

 “[Mauterer]: Yes. It has by population geneticists. In fact, it’s also been published in the Journal of Forensic Sciences.
 

 “[Prosecutor]: What are those results?
 

 “[Mauterer]: The results were that they are within the limits of the other — within limitations of other databases that are out there across the United States.
 

 “[Prosecutor]: Have you — had your database statistics been checked by other experts in the field of human population genetics?
 

 “[Mauterer]: Yes, sir.
 

 “[Prosecutor]: What are those results?
 

 “[Mauterer]: They come up with the same conclusions.
 

 “[Prosecutor]: Are the statistical methods used in your laboratory to calculate an estimate — excuse. Are the statistical methods used in your laboratory to calculate an estimate of the significance of the DNA match generally accepted in the relevant scientific community?
 

 “[Mauterer]: Yes. In fact, the procedures that we use are recommended through the [National Research Council] report from 1996.”
 

 (R. 498-99.) After cross-examination Mauterer once again testified that the databases he used for statistical comparisons in this case were generally accepted in the scientific community as reliable and had been published in the “Journal of Forensic Science within the past couple of years.” (R. 539-40.)
 

 In
 
 Roberts v. United States,
 
 916 A.2d 922 (D.C.2007), the court noted the following about the reliability of population statistics on mixed samples:
 

 “The argument has narrowed as this appeal has progressed. It began as a claim that there are no generally accepted methods for interpreting mixed-DNA
 
 *898
 
 samples, because there are no reliable methods for identifying the number of contributors, determining the individual genotypes (or profiles) of each contributor, or distinguishing between indications of a true DNA allele and indications of other by-products or ‘artifacts’ of the PCR/STR testing process, such as ‘stutter.’ Appellant cites no cases in which DNA evidence was found inadmissible under
 
 Frye [v. United States,
 
 293 F. 1013 (D.C.Cir.1923) ] (or a similar admissibility standard) for these reasons, and the government cites numerous decisions holding that application of the PCR/STR process to mixed samples either raises no issue of admissibility or has been shown to be generally accepted and reliable. We agree with that conclusion; the various articles from science journals cited by appellant do not persuade us that any existing disagreement about the general reliability of interpreting mixed samples presents an issue of admissibility, rather than one on which he was free to cross-examine [the expert] or present contrary expert testimony to the jury.”
 

 916 A.2d at 931-32 (footnotes omitted).
 

 Here, the fact that the sample was mixed, i.e., that it contained at least the blood of two individuals, would not affect the admissibility of population-frequency statistics related to the sample; rather, it would affect its credibility. See
 
 Commonwealth v. Patterson,
 
 445 Mass. 626, 840 N.E.2d 12 (2005). Therefore, we find no plain error.
 

 B.
 

 Second, Brown argues that the DNA evidence should have been excluded because the DNA expert did not identify the DNA method he used to conduct the specific DNA tests in this case.
 

 Brown’s argument is not supported by the record. At the hearing on the admission of the DNA evidence, Mauterer testified:
 

 “Yes, once a stain is identified, the first step is to actually remove the DNA from that substrate, whether it be a swabbing or a piece of paper or whatever it may have been on, and actually remove that from substrate and wash it clean. Once you have it washed, you have nothing but that DNA presence in the tube. You would make multiple copies using
 
 PCR
 
 to actually look at the locations that you looked at for DNA typing.”
 

 (R. 494) (emphasis added).
 
 [8]
 
 Mauterer testified that the polymerase chain reaction or the “PCR” method was used to conduct the DNA tests in this case.
 

 Mauterer’s detailed testimony more than met the requirements of the
 
 Turner v. State,
 
 746 So.2d 355 (Ala.1998), test.
 

 C.
 

 Third, Brown argues that the circuit court erroneously allowed the DNA test comparisons based on blood that was seized from Brown while he was incarcerated. He raises three different arguments in support of this contention.
 

 1.
 

 Brown first contends that the State failed to establish probable cause for seizing his blood. The record shows that no objection was raised on this ground at trial; therefore, we are limited to applying a plain-error analysis. See Rule 45A, Ala. RApp.P.
 

 
 *899
 
 The record shows that Brown’s blood was seized pursuant to a search warrant. The warrant states, in part:
 

 “Affidavit in support of application for a search warrant having been made before me, and the Court’s finding that grounds for the issuance exists or that there is probable cause to believe that they exist, pursuant to Rule 3.8, Alabama Rules of Criminal Procedure, you are hereby ordered apd authorized to forthwith search:
 

 “Michael Lee Brown, W/M, DOB: 04-23-77, approximately 6'00” tall and approximately 260 lbs., currently in custody at the Jefferson County Jail, Bessemer Division,
 

 “for head, body and pubic hair samples along with blood samples and saliva samples as evidence of a crime, to-wit: murder.
 

 “You are further commanded to seize only such samples as are deemed reasonably necessary for purposes of comparison, in a medically accepted manner, and with regard to the provisions of the Code of Alabama, 1975, concerning the taking of blood.”
 

 (State’s exhibit number 67.) Because Brown’s blood was seized pursuant to a search warrant the seizure was presumed valid. As we stated in
 
 Smith v. State,
 
 588 So.2d 561 (Ala.Crim.App.1991):
 

 “‘With regard to search warrants, the general rule is that the defendant has the burden of proof in challenging the validity of the execution or service of the search warrant.
 
 United States v. Marx,
 
 635 F.2d 436, 441 (5th Cir.1981). “The warrant stands cloaked with the presumption of validity both in the court below and on this appeal. The appellant had the burden of proof in challenging the validity of its execution or service.”
 
 United States v. Vigo,
 
 413 F.2d 691, 693 (5th Cir.1969).’ ”
 

 588 So.2d at 577, quoting
 
 Brownlee v. State,
 
 535 So.2d 217 (Ala.Crim.App.), rev’d on other grounds, 535 So.2d 218 (Ala.1988).
 

 The record shows that Brown never contested the validity of the search warrant to seize his blood; therefore, we presume that the warrant was valid. See
 
 Smith.
 

 2.
 

 Brown next argues that he was entitled to have counsel present when his blood was seized. He cites Rule 16.2(b)(6), in support of this contention. Again, Brown did not raise this objection at trial; therefore, we may only determine if there is plain error. See Rule 45A, Ala.RApp.P.
 

 Rule 16.2(b), Ala.R.Crim.P., states, in pertinent part:
 

 “Upon motion of the state/municipality and solely in connection with the particular offense with which the defendant is charged, the court shall order the defendant to:
 

 [[Image here]]
 

 “(6) Permit the taking of samples of defendant’s hair, blood, saliva, urine, or other specified materials which involve no unreasonable intrusions into the body;
 

 [[Image here]]
 

 “The defendant shall be entitled to the presence of counsel at the taking of such evidence.”
 

 Rule 16 governs discovery in a criminal case, not matters related to the investigation of a criminal case. Alabama has never specifically addressed whether a defendant is entitled to have counsel present when a blood sample is taken from a suspect.
 

 In this case, the murder occurred on October 12, 2001, Brown was arrested and brought in for questioning on October 21,
 
 *900
 
 2001, and the search warrant to secure a blood sample from him was issued on October 23, 2001. Brown was formally indicted on March 7, 2002.
 

 In
 
 Ex parte Stewart,
 
 853 So.2d 901 (Ala.2002), the Alabama Supreme Court discussed when the right to counsel attaches in Alabama. The Court stated:
 

 “In
 
 Kirby v. Illinois,
 
 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the United States Supreme Court held that the right to counsel does not attach before the ‘initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.’ The Court explained why the Sixth Amendment right to counsel did not attach until the initiation of adversarial proceedings, stating:
 

 “ ‘The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the “criminal prosecutions” to which alone the explicit guarantees of the Sixth Amendment are applicable.’
 

 “Kirby,
 
 406 U.S. at 689-90, 92 S.Ct. 1877 (footnote omitted). The right to counsel attaches after adversarial proceedings are initiated because the ‘ “core purpose” of the counsel guarantee is to assure and aid at trial, “when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor.” ’
 
 United States v. Gouveia,
 
 467 U.S. 180, 188-89, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)(quoting
 
 United States v. Ash,
 
 413 U.S. 300, 309, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973)). The Court has further held that even when the Sixth Amendment right to counsel may have attached, it does not exist to protect the defendant at all post-attachment proceedings, unless the proceeding is considered a ‘critical stage.’ In
 
 United States v. Wade,
 
 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Court described a critical stage as a ‘pretrial proceeding[ ] where the results might well settle the accused’s fate and reduce the trial to a mere formality.’ For example, the interrogation of a defendant, occurring after the attachment of the right to counsel, is a critical stage of the proceedings and the defendant is entitled to the assistance of counsel during the interrogation.
 
 Michigan v. Jackson,
 
 475 U.S. 625, 629-30, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (‘The arraignment [under Michigan law] signals “the initiation of adversary judicial proceedings” and thus the attachment of the Sixth Amendment ...; thereafter, government efforts to elicit information from the accused, including interrogation, represent “critical stages” at which the Sixth Amendment applies.’).
 

 “Thus, the Sixth Amendment right to counsel is at issue only where adversary judicial criminal proceedings have been initiated against the defendant and where the defendant lacks assistance of counsel at a critical stage in the proceedings.
 

 “As previously noted, the initiation of formal proceedings may occur at the preliminary hearing, upon the filing of the indictment or information, or at arraignment.
 
 Kirby,
 
 406 U.S. at 689, 92
 
 *901
 
 S.Ct. 1877. In Alabama, the initiation of adversary judicial proceedings for a felony prosecution begins with the issuance of an indictment. Ala. Const.1901, Art. I, § 8.”
 

 853 So.2d at 903.
 

 According to the Alabama Supreme Court’s holding in
 
 Stewart,
 
 Brown had no right to counsel when his blood sample was taken in this case because no formal adversarial proceedings had been initiated against him at the time that the search warrant for his blood was secured and served.
 

 Moreover, even if the right to counsel had attached, an accused is entitled to counsel only at a “critical stage” of the proceedings against him. The vast majority of courts that have considered this issue hold that the drawing of blood is not a critical stage; therefore, there is no right to have counsel present before the sample is drawn. See
 
 State v. Blye,
 
 130 S.W.3d 776 (Tenn.), cert. denied, 543 U.S. 845, 125 S.Ct. 289, 160 L.Ed.2d 74 (2004);
 
 State v. Delisle,
 
 137 N.H. 549, 630 A.2d 767 (1993);
 
 Mogard v. City of Laramie,
 
 32 P.3d 313 (Wyo.2001);
 
 Ormond, v. State,
 
 599 So.2d 951 (Miss.1992);
 
 McClain v. State,
 
 274 Ind. 250, 410 N.E.2d 1297 (1980). As the Supreme Court of New Hampshire wrote:
 

 “A defendant’s right to assistance of counsel attaches ‘by virtue of the commencement of formal criminal proceedings.’
 
 State v. Bruneau,
 
 131 N.H. 104, 108, 552 A.2d 585, 587-88 (1988). After the right to counsel has attached, a defendant is entitled to assistance of counsel at ‘critical stages’ of criminal proceedings.
 
 State v. Greene,
 
 128 N.H. 317, 320, 512 A.2d 429, 431 (1986). The defendant contends that the execution of a warrant to seize blood is a critical stage of a criminal proceeding, thus entitling him to assistance of counsel before the blood sample is taken. We disagree.
 

 “The assistance of counsel is provided at critical stages of criminal proceedings in order to preserve a defendant’s right to a fair trial.
 
 See State v. Petkus,
 
 110 N.H. 394, 397, 269 A.2d 123, 125 (1970),
 
 cert. denied,
 
 402 U.S. 932, 91 S.Ct. 1522, 28 L.Ed.2d 867 (1971). In
 
 Petkus,
 
 we held that the taking of a defendant’s blood under the implied consent law, currently found at RSA 265:84 (Supp. 1992), was not a critical stage of criminal proceedings requiring the assistance of counsel.
 
 Id,.
 
 ‘[Decisions to be made by an accused under our implied consent law are not essentially “a lawyer’s decision” but, on the contrary, can be made by a defendant in the absence of the assistance of counsel without any substantial prejudice to [the accused’s] rights under the sixth amendment.’
 
 Id.
 
 (citation omitted).
 

 [[Image here]]
 

 “The fact that the defendant faced a felony conviction does not transform the taking of a sample of his blood into a critical stage of the proceedings. The defendant, unlike Petkus and Greene, had no choice as to whether he would provide the State with a blood sample. That decision was made by the magistrate who found probable cause for the seizure of the defendant’s blood; the defendant has not appealed that finding here. We fail to see the utility of requiring the assistance of counsel before a court-ordered blood sample is taken. Even if the police had allowed Delisle to confer with his attorney before taking him to the hospital, there is little that the attorney could have said or done in furtherance of Delisle’s right to a fair trial. Counsel was certainly not in a position to advise Delisle not to submit to blood sampling.”
 

 
 *902
 

 State v. Delisle,
 
 137 N.H. at 550-51, 630 A.2d at 767-68.
 

 3.
 

 Brown further argues that the DNA testimony should have been excluded because, he says, there was no proper chain of custody for the blood sample taken from him while he was incarcerated at the Jefferson County jail.
 

 There was no objection made to the chain of custody; therefore, we review this issue for plain error. See Rule 45A, Ala. R.App.P.
 

 The record shows that Det. Ha-gler testified that he was with nurse William Spencer when the blood was drawn from Brown. He said that Spencer put the sample in an envelope, sealed the envelope, and initialed it. Det. Hagler then took possession of the envelope, put it in a locked safe in his office, and the next day he delivered the sample to the Alabama Department of Forensic Science.
 

 “The chain of custody is composed of ‘links.’ A ‘link’ is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link’s possession of the item: ‘(1) [the] receipt of the item; (2) [the] ultimate disposition of the item,
 
 i.e.,
 
 transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.’ Imwinklereid,
 
 The Identification of Original, Real Evidence,
 
 61 Mil.L.Rev. 145, 159 (1973).”
 

 Ex parte Holton,
 
 590 So.2d 918, 920 (Ala.1991). A proper chain of custody was established for the blood sample in this case.
 

 XII.
 

 Brown next argues that his right to cross-examine his accusers was violated when the State was allowed to elicit a statement Robert Smith had made to police. Specifically, he argues: “During the testimony of Det. Hagler, the lead investigating officer in this case, the prosecuting attorney elicited evidence that Robert Smith had made out-of-court statements to the Detective denying involvement in this crime and implicating Mr. Brown.” (Brown’s brief at page 6.)
 

 Initially, we note that Brown did not object when this testimony was elicited; therefore we review this claim for the plain error. See Rule 45A, Ala.R.App.P.
 

 It was the State’s theory of the case that Brown was the sole person who robbed and murdered Betty Kirkpatrick. Brown’s defense was that he and three other individuals went to Kirkpatrick’s home to commit a robbery but that Robert Smith actually committed the murder.
 

 The record shows that during direct examination Det. Hagler testified that Brown told him that he and three other individuals were involved in the robbery but that Smith committed the murder. No mention was made of any statements that Smith had made to police or the fact that Smith had even been questioned by police.
 

 On cross-examination, the defense elicited testimony that Smith had been questioned by police, that the statement had been audiotaped, that Smith was read his
 
 Miranda
 
 rights, that Smith signed a waiver form, that Hagler had not submitted fingerprints from Smith for comparison with the fingerprints discovered in the victim’s car, and that when Hagler obtained a warrant for a sample of Brown’s blood he stated the following in the affidavit in support of the warrant: “Michael Brown states that he and three others entered the residence of Betty Kirkpatrick with the
 
 *903
 
 intent of robbing her. The suspect states that one of the other suspects choked the victim and cut her throat killing her. They then took her purse and jewelry and her car.” (R. 481.)
 

 On redirect, the State elicited the following:
 

 “[Prosecutor]: Did you tell Robert Smith why you were talking to him?
 

 “Pet Hagler]: Yes, I did.
 

 “[Prosecutor]: Did Robert Smith say anything to you about being involved in the death of Betty Kirkpatrick?
 

 “[Det. Hagler]: He was adamant that he was not involved. He gave the names of people that he was with ... who verified where he was during the night of the evening in question. And he also said that Mr. Brown had made statements about the murder.”
 

 (R. 484-85.) Brown argues that his right to cross-examine Smith was violated by the introduction of the above testimony.
 
 [9]
 

 “When the calling party has [a] witness on redirect examination, the object is to answer any matters brought out on the cross-examination of the witness by the adversary.” 2 Charles W. Gamble,
 
 McElroy’s Alabama Evidence
 
 § 439.01(1) (5th ed.1996). In
 
 Morgan v. State,
 
 589 So.2d 1315, 1320-21 (Ala.Crim.App.1991), we stated:
 

 “The appellant cannot complain about exploration of an issue which the appellant injected into trial.
 
 Morgan v. State,
 
 440 So.2d 1240 (Ala.Cr.App.1983). ‘Where a matter has been gone into by one party to a cause, the other party has the right to explain away anything, if he can, that may have been brought out to his detriment.’
 
 Wyrick v. State,
 
 409 So.2d 969, 975 (Ala.Cr.App.1981), cert. denied, 409 So.2d 969 (Ala.1982). A defendant is not permitted to present evidence to the jury on a specific issue and object when the state attempts to introduce evidence on the same point.
 
 Billingsley v. State,
 
 402 So.2d 1052 (Ala.Cr.App.1980), rev’d on other grounds, 402 So.2d 1060 (Ala.1981), cert. denied, 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 681 (1984).”
 

 In
 
 Walker v. State,
 
 631 So.2d 294 (Ala.Crim.App.1993), we noted how wide the door is opened when a matter is first brought out during cross-examination. We stated:
 

 “The appellant cannot be heard to complain ... ‘ “about exploration of the issue ... which he himself improperly injected into the trial.”
 
 [Morgan v. State,
 
 440 So.2d 1240, 1241 (Ala.Cr.App.1983) ]. “Rebuttal evidence, even evidence of prior crimes, is generally admissible within the sound discretion of the trial court.
 
 Vincent v. State,
 
 231 Ala. 657, 165 So. 844 (1936);
 
 Jones v. State,
 
 [362 So.2d 1303 (Ala.Cr.App.1978) ];
 
 Norris v. State,
 
 429 So.2d 649 (Ala.Cr.App.1982).”
 
 Peterson v. State,
 
 452 So.2d 1372 (Ala.Cr.App.1984).’
 
 Campbell v. State,
 
 508 So.2d 1186, 1189 (Ala.Cr.App.1986). ‘The state may examine a witness on redirect as to matters injected into a case on cross-examination by the defense.’
 
 Hollingsworth v. State,
 
 549 So.2d 110, 111 (Ala.Cr.App.1988), and cases cited therein.”
 

 631 So.2d at 301.
 

 The Alabama Supreme Court in
 
 Ex parte D.L.H.,
 
 806 So.2d 1190 (Ala.2001),
 
 *904
 
 referred to this rule of evidence as the doctrine of curative admissibility. The court stated:
 

 “When one party opens the door to otherwise inadmissible evidence, the doctrine of ‘curative admissibility’ provides the opposing party with ‘the right to rebut such evidence with other illegal evidence.’
 
 McElroy’s Alabama Evidence,
 
 § 14.01, p. 49 (5th ed.1996). ‘[T]he law [is] that even though a party introduces evidence that may be immaterial or illegal, his opponent has the right to rebut such evidence and this right is unconditional.’
 
 Clark v. State,
 
 54 Ala.App. 183, 186, 306 So.2d 51, 54 (1974). ‘ “A party who has brought out evidence on a certain subject has no valid complaint as to the trial court’s action in allowing his opponent or adversary to introduce evidence on the same subject.” ’
 
 Hubbard v. State,
 
 471 So.2d 497, 499 (Ala.Crim.App.1984) (quoting
 
 Brown v. State,
 
 392 So.2d 1248, 1260 (Ala.Crim.App.1980),
 
 cert. denied,,
 
 392 So.2d 1266 (Ala.1981)).”
 

 806 So.2d at 1193. See
 
 Tinker v. State,
 
 932 So.2d 168 (Ala.Crim.App.2005) (this court noted that we did not have to reach the issue of alleged
 
 Crawford, v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), violation because evidence was admissible under the doctrine of curative admissibility).
 

 Other jurisdictions also agree that a party has a right to clarify or rebut a false impression created on cross-examination. The United States Court of Appeals for the Eighth Circuit aptly stated in
 
 United States v. Beason,
 
 220 F.3d 964, 968 (8th Cir.2000):
 

 “The trial court has broad discretion in the admission of evidence and its decision will be overturned on appeal only if there has been an abuse of discretion.
 
 See United States v. Rogers,
 
 939 F.2d 591, 594 (8th Cir.1991). ‘It is fundamental that where the defendant “opened the door” and “invited error” there can be no reversible error.’
 
 United States v. Steele,
 
 610 F.2d 504, 505 (8th Cir.1979). We have allowed the use of otherwise inadmissible evidence to clarify or rebut an issue opened up by defense counsel on cross-examination.
 
 See United States v. Womochil,
 
 778 F.2d 1311, 1315 (8th Cir.1985) (no abuse of discretion in allowing government to clarify false impression created on cross-examination);
 
 United States v. Finch,
 
 16 F.3d 228, 233 (8th Cir.1994) (under ‘opening the door’ theory, evidence introduced must rebut something that has been elicited on cross-examination).
 

 “Beason’s theory of defense at trial was that Washington orchestrated the events in question, while Beason was an unknowing bystander. We find defense counsel’s questioning, stressing not only that information regarding the hidden currency did not come from Beason, but also that it came from Washington, an individual with a prior drug record, did more than simply dispel an assumption that Beason provided the information. It could have created a misleading inference to the jury that Washington was the ‘bad guy,’ thereby bolstering Bea-son’s defense theory. Although the inference may not be as powerful as the government contends, we cannot say the district court abused its substantial discretion by allowing the government to clarify or rebut any false impression created on cross-examination.
 
 See United States v. Durham,
 
 868 F.2d 1010, 1012 (8th Cir.1989). Thus, we find that admission of the evidence in question did not violate
 
 Bruton [v. United States,
 
 391 U.S. 123 (1968) ].”
 

 See also
 
 Walsh v. State,
 
 596 So.2d 756 (Fla.Dist.Ct.App.1992).
 

 
 *905
 
 “ ‘The doctrine of opening the door allows a party to explore otherwise inadmissible evidence on cross-examination when the opposing party has made un-ían* prejudicial use of related evidence on direct examination.’
 
 United States v. Lum,
 
 466 F.Supp. 328, 334 (D.Del.) (citations omitted),
 
 aff'd without opinion,
 
 605 F.2d 1198 (3d Cir.1979). ‘The doctrine ... is limited to testimony that might explain or contradict the testimony offered by the opposing party on direct examination; it cannot be “subverted into a rule for injection of prejudice.” ’
 
 Id.
 
 at 335 (quoting
 
 United States v. Winston,
 
 447 F.2d 1236, 1240 (D.C.Cir.1971)).”
 

 United States v. Durham,
 
 868 F.2d 1010, 1012 (8th Cir.1989), cert. denied, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989).
 

 Here, the defense counsel implied on cross-examination that Det. Hagler acted irresponsibly in not investigating Robert Smith. To rebut the matters that were presented on cross-examination the State had a right to question Det. Hagler so that Det. Hagler could explain his actions during the course of the investigation. Under the caselaw cited above, we hold that there was no error, much less plain error.
 

 XIII.
 

 Brown next argues that the circuit court erred in allowing evidence of what he alleges is prior bad acts to be admitted. Brown cites several instances in support of this contention.
 

 Brown made no objections to any of the challenged evidence; therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 

 A.
 

 First, Brown argues that it was error for the circuit court to allow Det. Hagler to testify that when he attempted to locate Brown he found that Brown was in the custody of the Birmingham Police Department.
 

 In
 
 Barnes v. State,
 
 727 So.2d 839, 843 (Ala.Crim.App.1997), we stated:
 

 “Our review of the record leads us to conclude that French’s testimony did not rise to the level of plain error. French’s reference to the arrest warrants was unsolicited and was merely an attempt to explain the circumstances surrounding Barnes’s arrest. This Court has found that ‘ “an indirect reference to the defendant’s involvement in other crimes is not incurably harmful to the accused, and any possible prejudice may be eradicated by the trial judge’s prompt curative instruction to the jury.” ’
 
 McDonald v. State,
 
 516 So.2d 868, 871 (Ala.Cr.App.1987) (quoting
 
 Brooks v. State,
 
 462 So.2d 758, 760 (Ala.Cr.App.1984)). While no curative instruction was given in the instant case, we note that the defense did not request a curative instruction.”
 

 To constitute plain error the error must be so egregious that it affected the integrity of the proceedings. We cannot say that the comment amounted to plain error.
 

 B.
 

 Second, Brown argues that it was error for the circuit court to allow State’s witness Kevin Clayton to testify that he and Brown had been arrested on an unrelated robbery charge.
 

 The record shows that on cross-examination Clayton was questioned as to how he came to make a statement to the police about the murder, about his location at the time of the statement, and the fact that he and Brown were being held together at the Birmingham Detention Center at the time of the questioning. On redirect by the State, the following occurred:
 

 
 *906
 
 “[Prosecutor]: Kevin, I hate to ask you this, but since we went into it, let me ask you: You were talking about a robbery case that you and him picked up?
 

 “[Clayton]: Yes, sir.
 

 “[Prosecutor]: It wasn’t this case, was it?
 

 “[Clayton]: No, sir.
 

 “[Prosecutor]: It wasn’t the case where the lady died in Hueytown, was it?
 

 “[Clayton]: No, sir.
 

 “[Prosecutor]: It was something else, wasn’t it?
 

 “[Clayton]: Yes, sir.
 

 “[Prosecutor]: Okay. So, there’s no allegation that you were involved in this case; right?
 

 “[Clayton]: No, sir.”
 

 (R. 346-47.)
 

 Defense counsel clearly opened the door to this line of questioning on cross-examination. As we previously stated, when the door is opened, evidence of other crimes is admissible as proper rebuttal evidence. Cf.
 
 Barnes v. State,
 
 supra (no plain error in reference to prior burglary because Barnes admitted burglary but not the murder).
 

 C.
 

 Third, Brown argues that it was error for the circuit court to allow the following testimony during the direct examination of State’s witness Kelly Watkins:
 

 “[Prosecutor]: What happened to the car on Saturday?
 

 “[Watkins]: He told me that some detectives had gotten behind him and was trying to pull him over, and he jumped out of the car and ran from the police.
 

 “[Prosecutor]: Did you think anything about it at that point about him abandoning [Betty Kirkpatrick’s] car?
 

 “[Watkins]: I figured maybe something — I figured he might have had a warrant, and that is why he ran.”
 

 (R. 377-78.)
 

 In
 
 Massey v. State,
 
 49 Ala.App. 341, 343-44, 272 So.2d 267, 269 (Crim.App.1972), cert. denied, 289 Ala. 747, 272 So.2d 270 (1973), we addressed a similar issue and stated:
 

 “During the redirect examination of Powell E. Morris, a witness for the State who was a criminal laboratory technician for the City of Birmingham, he testified that he had made an examination of the pistol in question and of the bullets and shell casing which had been submitted to him. He was asked, ‘Do you keep records showing what you received when you were with the City,’ and he answered, ‘Yes, sir, but — these records were used in the last case. I don’t know who has them, my receipts and what have you.’ The appellant argues that this reference to the ‘last case’ by this witness was error. Here, however, there was no objection to this at the time the unsolicited response was made by the witness, nor was there a motion to exclude or a motion to strike same. The rule governing this is found in
 
 Ivory v. State,
 
 237 Ala. 344, 186 So. 460 [ (1939) ]; and in the absence of the objection and appropriate motion where such unsolicited response comes in, such failure to act constitutes a waiver and may not be made the object of a motion for a mistrial at a later time in the proceedings. See also
 
 Treadaway v. State,
 
 18 Ala.App. 409, 92 So. 529 [ (1922) ]; and
 
 Howton v. State,
 
 21 Ala.App. 237, 107 So. 28 [ (1926) ].”
 

 Watkins’s response was unsolicited by the State, and Brown did not move to strike the answer. The jury could easily have inferred that Watkins was referencing an arrest warrant for the capital-murder charges involved in this case. “We
 
 *907
 
 cannot conclude that the unsolicited comment ... prejudiced [the appellant] to the point of plain error....”
 
 Barnes v. State,
 
 727 So.2d at 843. See also
 
 Dill v. State,
 
 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993) (no plain error when witness said that defendant had a parole officer). Accordingly, we find no plain error.
 

 XIV.
 

 Brown next argues that there were numerous instances of prosecutorial misconduct that denied him a fair trial. The majority of the instances relate to claims of improper prosecutorial argument in opening and closing statements. No objections were made to any of the challenged instances of alleged misconduct; therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 

 “While the failure to object will not bar our review of [the appellant’s] claim of prosecutorial misconduct, it will weigh against any claim of prejudice that Calhoun makes on appeal ‘ “ ‘because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ ” ’
 
 Ferguson v. State,
 
 814 So.2d 925, 945 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001), cert. denied, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002), quoting
 
 Kuenzel v. State,
 
 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).”
 

 Calhoun v. State,
 
 932 So.2d 923, 962 (Ala.Crim.App.2005), cert. denied, 548 U.S. 926, 126 S.Ct. 2984, 165 L.Ed.2d 990 (2006).
 

 The following standard of review is used when reviewing claims of improper prosecutorial argument:
 

 “ ‘ “The relevant question is whether the prosecutor’s comments ‘so infected the trial with unfairness as to make the insulting conviction a denial of due process.’ ”
 
 Darden v. Wainwright, 477
 
 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting
 
 Donnelly v. DeChristoforo,
 
 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial.
 
 Duren v. State,
 
 590 So.2d 360, 364 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).’”
 

 Bonner v. State,
 
 921 So.2d 469, 473 (Ala.Crim.App.2005), quoting
 
 Simmons v. State,
 
 797 So.2d 1134, 1162 (Ala.Crim.App.1999).
 

 Furthermore, the circuit court on several occasions instructed the jury that arguments of counsel were not evidence. “We presume that the jury follows the circuit court’s instructions.”
 
 Calhoun v. State,
 
 932 So.2d at 965.
 

 Before closing arguments in the guilt phase the circuit court gave the following instruction:
 

 “In the arguments, the attorneys may call your attention to evidence which they consider to be material and will ask you to draw certain inferences from that evidence. Please keep in mind, however, that you are not bound by their recollection of the evidence. That it is your recollection of the evidence that controls in this case. Your recollection alone must guide your deliberations.
 

 [[Image here]]
 

 “Let me say that they may also call your attention to certain principles of law during their arguments. You are not bound by any principles of law mentioned by counsel. You must apply only the law to which you are instructed by me to the facts as you find them to be.”
 

 (R. 552-53.)
 

 A.
 

 First, Brown argues that the prosecutor falsely stated in closing argument
 
 *908
 
 that he had offered Brown no deal to plead guilty. He asserts that the record shows that Brown was offered a deal; therefore, he says, the statement was false, misleading, and resulted in reversible error.
 

 In rebuttal closing argument at the guilt phase, the prosecutor made the following argument:
 

 “That is the case of State of Alabama v. Michael Brown. The case of Alabama v. Robert Smith, who would that be based on? Well, who told us it was Michael Smith — or Robert Smith? Case of Alabama v. Kevin Clayton, who would that case be built around? Michael Brown. Moses — what is Moses’ last name? Smiley. Who would that case be built around? Michael Brown. I say hell no, no deals. You are going to be held responsible for what you did. You are not going to sneak in here and ask for a deal and go nail some other people when your DNA is on that napkin. No.
 

 “Can we build a case another way? Maybe, but it is not going to be that way.
 

 “I know we all hear about deals and things like that. Oh, the State made a deal. Not this time. Now, you guys will get the opportunity to find him guilty of felony murder. That is your opportunity; but not me.
 

 “You don’t put a bag over a 65-year-old lady’s head, you don’t choke her, and you don’t cut her throat and then say deal time. I don’t care if you said [President] George Bush did it. If the DNA is on that napkin, you are riding around in the car and you are bragging about it, you are going to go to trial for it. What y’all do with it is up to you. I am not taking it away from you.”
 

 (R. 587-88.)
 

 Immediately before the prosecutor’s argument defense counsel made the following argument:
 

 “I can’t get around the fact — and I am not even going to try to — that Michael made the statement that he did to the police. And I am sorry that he was in the position that he made that statement and that he participated and knew there was a robbery.
 

 [[Image here]]
 

 “Ms. Kirkpatrick’s death was tragic. I will be the first to admit that. What I think is even more tragic is that there are apparently some people out there that had a part in this, and nobody is doing anything about it. And I think it is tragic that because of the fact that that is happening or has happened and will continue to happen, that apparently that Michael is going to suffer the full brunt of what happened when he only participated in a small portion of it.”
 

 (R. 588-86.)
 

 The record shows that before trial the State discussed with Brown the possibility of Brown’s pleading guilty to capital murder and receiving a sentence of life imprisonment without the possibility of parole. The following occurred at a pretrial hearing:
 

 “The Court: All right. I know that there was discussion of some possible resolution of this case. I presume that since we are ready to bring the jury up that this case — I was going to be advised at a later time.
 

 “[Defense counsel]: We have had numerous discussions about this with [the prosecutor] and with regard to a life sentence, and we have explored what, in fact, that would do to the sentence Mr. Brown is already serving, and [other defense counsel] has talked to several people in the Department of Corrections, and we have relayed that information to [the prosecutor]. And the idea was that if he pled to a life consecutive
 
 *909
 
 and how much would it increase his time and so forth. And we have gone over those figures with [the prosecutor], and he was not willing to extend that offer to us on the life consecutive sentence.
 

 “Failing that, he did offer to — offer us a sentence on a plea of guilty of life without parole, and [defense counsel] and I have explored this possibility in great detail with Mr. Brown on more than one occasion. And it is my understanding that Mr. Brown does not wish to accept that offer.... ”
 

 (R. 9-10.)
 

 After considering the prosecutor’s comment in the context of the entire trial, we conclude that the prosecutor was arguing that the State had not offered Brown a deal to plead guilty to felony murder and that it was the jury’s decision to determine whether Brown was guilty of felony murder or capital murder. Part of the prosecutor’s comment was in response to the comments of defense counsel in its closing argument. “ ‘When the door is opened by defense counsel’s argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply.’ ”
 
 Davis v. State,
 
 494 So.2d 851, 855 (Ala.Crim.App.1986) (quoting Defoor,
 
 Prosecutorial Misconduct in Closing Argument,
 
 7 Nova L.J. 443, 469-70 (1982-83)).
 

 “ ‘In reviewing allegedly improper pros-ecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.
 
 Whitlow v. State,
 
 509 So.2d 252, 256 (Ala.Cr.App.1987);
 
 Wysinger v. State,
 
 448 So.2d 435, 438 (Ala.Cr.App.1983);
 
 Carpenter v. State,
 
 404 So.2d 89, 97 (Ala.Cr.App.1980),
 
 cert. denied,
 
 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.
 
 Orr v. State,
 
 462 So.2d 1013, 1016 (Ala.Cr.App.1984);
 
 Sanders v. State,
 
 426 So.2d 497, 509 (Ala.Cr.App.1982).’ ”
 

 Barber v. State,
 
 952 So.2d 393, 437-38 (Ala.Crim.App.2005), cert. denied, 549 U.S. 1306, 127 S.Ct. 1875, 167 L.Ed.2d 366 (2007), quoting
 
 Bankhead v. State,
 
 585 So.2d 97, 106-07 (Ala.Crim.App.1989).
 

 The circuit court instructed the jury that arguments of counsel were not evidence. There is no indication that the prosecutor’s comment so infected the trial with unfairness that Brown was denied a fair trial. See
 
 Darden v. Wainwright,
 
 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Accordingly, we find no plain error.
 

 B.
 

 Second, Brown argues that the prosecutor improperly defined reasonable doubt in its closing argument and that that improper definition allowed the jury to convict Brown on a nonlegal standard of proof.
 

 The prosecutor made the following argument:
 

 “Reasonable doubt: You heard me talk about reasonable doubt during the first of this trial. It is a fair standard. It is a standard that each and every one of us would want applied to us if we were charged with a crime; prove the case beyond a reasonable doubt.
 

 “But I submit to you, ladies and gentlemen, it doesn’t mean beyond any doubt; it doesn’t mean beyond all doubt; and it doesn’t mean that we have to prove the case to a mathematical certainty. If that was — the only way that
 
 *910
 
 could happen, if that was required, we would have to go back in time and see what happened. And if we could do that, we wouldn’t need you, ladies and gentlemen.
 

 “And you are going to hear about the presumption of innocence. Absolutely, this defendant is presumed innocent. When he walked into the courtroom, he was presumed innocent. But that presumption only stays with him until such time that we prove to you his guilt. And I submit to you that we have. Remember I told you, you would know it in your gut what’s reasonable doubt? You will know it in your gut. And I think you know it in your gut.”
 

 (R. 558-59.)
 
 [10]
 

 The circuit court specifically instructed the jury that it was not to consider arguments of counsel as the arguments related to the law and that the court would instruct the jury as to the law applicable in the case. The court correctly instructed the jury on reasonable doubt. There is no evidence that the above argument so infected the trial with unfairness that Brown was denied a fair trial. See
 
 Darden v. Wainwright,
 
 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Accordingly, we find no plain error.
 

 C.
 

 Third, Brown argues that the prosecutor improperly vouched for the credibility of the State witnesses during closing argument. He challenges the following argument:
 

 “Ladies and gentlemen, I don’t vouch for the truth of [Brown’s] statement. All the State of Alabama vouches for is that he made a statement on that occasion. It is your job to decide what part of it is the truth and what part of it is a lie.”
 

 (R. 562.) He also challenges the following comment by the prosecution:
 

 “Did these people have anything to gain by lying to you? Is there any reward or benefit that will come to them by lying to you and telling you that this defendant didn’t tell them that he committed this crime, that he killed this lady, or he hit a lick, or whatever — however it was that he referred to it. Do they have anything to gain by lying to you? No.”
 

 (R. 560-61.)
 

 “A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. ‘[P]rosecutors must avoid making personal guarantees as to the credibility of the state’s witnesses.’
 
 Ex parte Parker,
 
 610 So.2d 1181 (Ala.1992). See
 
 Ex parte Waldrop,
 
 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
 

 “ ‘ “Attempts to bolster a witness by vouching for his credibility are normally improper and error.” ... The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness’ credibility.... This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness’ veracity.... Secondly, a prosecutor may implicitly vouch for the witness’
 
 *911
 
 veracity by indicating that information not presented to the jury supports the testimony.’
 

 “United States v. Sims,
 
 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).”
 

 DeBruce v. State,
 
 651 So.2d 599, 610-11 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994).
 

 In
 
 Jackson v. State,
 
 674 So.2d 1318 (Ala.Crim.App.1993), rev’d on other grounds, 674 So.2d 1365 (Ala.1994), we held that similar arguments were not improper. “[T]he prosecutor’s comments in this case did not constitute personal guarantees as to the witnesses’ credibility, but rather were proper inferences from the evidence, and, therefore, did not constitute error.” 674 So.2d at 1336-37. There was no plain error.
 

 D.
 

 Fourth, Brown argues that the prosecutor improperly argued victim-impact evidence in his closing at the guilt phase when he made the following argument:
 

 “And there’s not one thing that you ladies and gentlemen can do to bring this lady back. There is no way that you are going to make this thing all right.
 
 But, you know, you can sure make it a whole lot worse if the person responsible for her death is not held accountable.”
 

 (R. 565) (emphasis added).
 

 While we do not condone the prosecutor’s comments, we cannot say that the argument so infected the trial with unfairness that Brown was denied his constitutional right to a fair trial. The Alabama Supreme Court in
 
 Ex parte Rieber,
 
 663 So.2d 999 (Ala.1995), held that the admission of victim-impact evidence at the guilt phase of a capital trial did not amount to plain error. The court stated:
 

 “We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig’s testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected — that Ms. Craig [the murder victim] was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in
 
 Payne v. Tennessee,
 
 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).”
 

 663 So.2d at 1006. For the reasons stated in
 
 Rieber,
 
 we find no plain error.
 

 XV.
 

 Brown argues that there was a material variance between the indictment and the proof at trial. He first contends that the indictment charged him with causing the death of Betty Kirkpatrick by “choking and cutting her throat” but that the coroner testified that Kirkpatrick died of strangulation and that she was most
 
 *912
 
 likely not breathing when her throat was cut.
 
 [11]
 

 We addressed a similar issue in
 
 Thompson v. State,
 
 542 So.2d 1286 (Ala.Crim.App.1988), aff'd, 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 986, 110 S.Ct. 528, 107 L.Ed.2d 527 (1989), and stated:
 

 “ ‘[N]o variance ought ever to be regarded as material where the allegation and proof substantially correspond, or where the variance was not of a character which could have misled the defendant at the trial.’
 
 Washington & Georgetown R.R. v. Hickey,
 
 166 U.S. 521, 531, 17 S.Ct. 661, 665, 41 L.Ed. 1101 (1897).
 

 “Moreover, the actual inquiry
 

 “ ‘is not whether there has been a variance in proof, but whether there has been such a variance as to “affect the substantial rights” of the accused. The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense.’
 

 “Berger v. United States,
 
 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).
 

 “ ‘In order to be valid an indictment must: (1) show the accused what to prepare a defense against; (2) identify the offense so that he is tried for the same charge that was brought before the grand jury; (3) protect somewhat against double jeopardy; and (4) give the court the means to accept or reject the verdict, pronounce judgment, and pass sentence.
 
 Baker v. State,
 
 [472 So.2d 700, 702 (Ala.Cr.App.1985) ];
 
 Bowens v. State,
 
 309 So.2d 850 (Ala.1975);
 
 Sanders v. State,
 
 278 Ala. 453, 179 So.2d 35 (1965).’
 

 “Talley v. City of Clanton,
 
 495 So.2d 1165, 1167 (Ala.Cr.App.1986). See also § 15-8-25,
 
 Code of Alabama
 
 (1975).
 

 “The appellant admitted committing each of these acts upon the victim. Aside from his defense of insanity, he raised a defense to establish that, although he was guilty of murder, the murder was not committed
 
 during
 
 the commission of the other alleged felonies, and therefore he was not guilty of the capital offense. There was never any denial of the beating, strangling, stabbing, cutting, or dragging; moreover, they were admitted by one of the appellant’s defense lawyers during his opening statement. Thus, the appellant clearly had notice of the charged offense. See
 
 Johnson v. State,
 
 508 So.2d 1192 (Ala.Cr.App.1986);
 
 Duren v. State,
 
 507 So.2d 111, 112-14 (Ala.Cr.App.1986), affirmed, 507 So.2d 121 (Ala.l98[7]), cert. denied, [484] U.S. [905], 108 S.Ct. 249, 98 L.Ed.2d 206 (1987). In
 
 Skidmore v. State,
 
 530 S.W.2d 316, 321 (Tex.Cr.App.1975), the court found no variance between the cause of death alleged in the indictment and the evidence, in light of the appellant’s confession that his accomplice pushed the deceased over an embankment. The indictment in that case alleged that death was caused ‘by
 
 *913
 
 pushing, shoving and throwing him over an embankment;’ whereas the medical expert testified that, in his opinion, the victim died ‘due to a fall [during which] his head impacted with a certain amount of speed, enough to render a person unconscious, until he couldn’t help himself and that with the head on the ground he would be unable to breathe and asphyxiated.’ The examiner found the cause of death to be asphyxiation.
 

 “Because the indictment specified the first and last of the series of acts which the appellant admitted to committing, he was clearly apprised of the crime with which he was charged. Because the State proved that the victim died of asphyxia and established sufficient proof that the asphyxia was a result of being beaten and, further, because the appellant admitted to committing the acts, ‘we are unable to find anything in the facts ... or in the record from which it reasonably can be said that the proof operated to prejudice his case, or that it came as a surprise.’
 
 Berger v. United States,
 
 295 U.S. 78, 83, 55 S.Ct. 629, 631. ‘ “[N]o variance ought ever to be regarded as material where the allegation and proof substantially correspond, or where the variance was not of the character which could have misled the defendant at the trial.” ’
 
 Id.
 
 See also
 
 Ex parte Lundy,
 
 539 So.2d 322 (Ala.1988).”
 

 542 So.2d at 1290-91.
 

 In this case, both counts of the two-count indictment charged Brown with murdering Betty Kirkpatrick by “choking and cutting her throat....” The coroner testified that Kirkpatrick died of “asphyxia by strangulation and smothering” and that he believed that she was not breathing when her throat was cut. Brown admitted that he went to the victim’s house to rob her but that he did not participate in the murder. The cause of the victim’s death was not in dispute. Clearly, there was no material variance in the indictment and the proof at trial that affected Brown’s substantial rights. See
 
 Thompson.
 
 Accordingly, we find no plain error.
 

 XVI.
 

 Brown next argues that the circuit court erred in denying his motion for a judgment of acquittal. Specifically, he argues that there was no evidence that Brown remained unlawfully in Betty Kirkpatrick’s house; therefore, there was no proof of a burglary. He cites
 
 Davis v. State,
 
 737 So.2d 480 (Ala.1999), to support his argument.
 

 The Alabama Supreme Court in
 
 Davis
 
 stated:
 

 “Evidence of a struggle that gives rise to circumstantial evidence of revocation of a license or privilege can be used to show an unlawful remaining, a separate prong of the offense of burglary upon which a conviction can be based. We are certainly mindful of the doctrine of stare decisis and recognize that
 
 [Ex parte] Gentry],
 
 689 So.2d 916 (Ala. 1996),] was decided only fairly recently; nevertheless, this Court must make a course correction if a correction is necessary. To the extent that
 
 Gentry
 
 is inconsistent with this rule, we overrule it.
 

 “We reiterate that the evidence of a commission of a crime, standing alone, is inadequate to support the finding of an unlawful remaining, but evidence of a struggle can supply the necessary evidence of an unlawful remaining. In homicide cases, the mere fact of the victim’s death cannot be equated with a struggle. For example, evidence of a privileged entry followed by death from an injury inflicted by surprise or stealth and causing instantaneous death would not constitute circumstantial evidence of an unlawful remaining. Likewise, a
 
 *914
 
 privileged entry followed by death from an injury inflicted by a delayed mechanism, such as poison, would be equally deficient.
 

 “The evidence was sufficient for the jury to find that Davis killed Harrington during a burglary. The evidence of a struggle giving rise to the inference of an unlawful remaining is supplied by Davis’s choice to kill by a less-than-instantaneous technique of strangulation and by his use of three nonfatal stab wounds to the victim’s lower back. Based on the circumstances suggested by the evidence, the jury reasonably could have found that Davis, from the point at which he began committing his criminal acts, £remain[ed] unlawfully’ in Harrington’s home with the intent to commit a crime.”
 

 737 So.2d at 483-84. The
 
 Davits
 
 court also stated: “The State is no longer required to prove that the defendant broke and entered the premises. Instead, the strictures of that element have been replaced with the general requirement of a trespass on premises through an unlawful entry or an unlawful remaining.” 737 So.2d at 483.
 

 Here, the evidence showed that the victim was strangled, assaulted, and asphyxiated. Under the ruling in
 
 Davis
 
 these facts were sufficient to satisfy the “unlawfully remains” element of Alabama’s burglary statute.
 

 Brown also argues that there was no evidence that he intended to rob Betty Kirkpatrick. Normally there is no direct evidence of intent. “ ‘Intent, we know, being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.’”
 
 Ex parte C.G.,
 
 841 So.2d 292, 301 (Ala.2002), quoting
 
 Pumphrey v. State,
 
 156 Ala. 103, 106, 47 So. 156, 157 (1908). In this case Brown made a statement and admitted that he went to Betty Kirkpatrick’s home with the intent to rob her. The question of Brown’s intent was properly submitted to the jury for its consideration.
 

 “ ‘ “The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury.
 
 McMurphy v. State,
 
 455 So.2d 924 (Ala.Crim.App.1984);
 
 Craig v. State,
 
 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.[Crim.App.] 1982).”
 
 Loper v. State,
 
 469 So.2d 707, 710 (Ala.Cr.App.1985).’ ”
 

 Payne v. State,
 
 946 So.2d 930, 935 (Ala.Crim.App.2006), quoting
 
 Oryang v. State,
 
 642 So.2d 989, 994 (Ala.Crim.App.1994).
 

 Brown further argues that there was not sufficient evidence to show that he stole Betty Kirkpatrick’s purse. Rick Kirkpatrick, Betty’s son, and his wife, Kathleen Kirkpatrick, testified that the victim’s purse was never found after Betty Kirkpatrick’s body was discovered. There was clearly sufficient evidence from which the jury could infer that the purse was taken during the same course of conduct that resulted in Betty Kirkpatrick’s death.
 

 Accordingly, the circuit court properly denied Brown’s motion for a judgment of acquittal and submitted the case to the jury for its determination.
 

 XVII.
 

 Brown argues that the circuit court’s jury instructions during the guilt phase of his trial were erroneous for numerous different reasons.
 

 “ ‘ “In setting out the standard for plain error review of jury instructions, the court in
 
 United States v. Chandler,
 
 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited
 
 Boyde v. California,
 
 494 U.S. 370, 380, 110 S.Ct. 1190, 108
 
 *915
 
 L.Ed.2d 316 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’
 
 Williams v. State,
 
 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997),
 
 cert. denied,
 
 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).” ’
 

 “Broadnax v. State,
 
 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting
 
 Pilley v. State,
 
 789 So.2d 870, 882-83 (Ala.Crim.App.1998). Moreover, ‘[w]hen reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.
 
 Ingram v. State,
 
 779 So.2d 1225 (Ala.Cr.App.1999).’
 
 Johnson v. State,
 
 820 So.2d 842, 874 (Ala.Crim.App.2000).”
 

 Snyder v. State,
 
 893 So.2d 488, 548 (Ala.Crim.App.2003), cert. denied, 893 So.2d 563 (Ala.2004), cert. denied, 544 U.S. 1062, 125 S.Ct. 2512, 161 L.Ed.2d 1113 (2005).
 

 No objections were made to any of the circuit court’s jury instructions. Therefore, we review these claims for plain error. See Rule 45A, Ala.R.App.P.
 

 A.
 

 First, Brown argues that the circuit court erred in its jury instruction on the “unlawfully remains” element of the burglary statute.
 

 Section 13A-7-5, Ala.Code 1975, states, in pertinent part: “A person commits the crime of burglary in the first degree if he or she knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein. ...”
 

 At the State’s request, the circuit court gave the following instruction on “unlawfully remains”:
 

 “ ‘Unlawfully remains’ includes a situation where the victim terminated the defendant’s license or privilege to remain on the premises and
 
 can
 
 be inferred where a struggle took place between the victim and defendant.”
 

 (R. 606) (emphasis added).
 

 This instruction was consistent with the Supreme Court’s opinion in
 
 Davis v. State,
 
 in which that Court stated: “Evidence of a struggle that gives rise to circumstantial evidence of revocation of a license or privilege
 
 can
 
 be used to show an unlawful remaining, a separate prong of the offense of burglary upon which a conviction can be based.” 737 So.2d at 483 (emphasis added). Accordingly, we find no plain error.
 

 B.
 

 Second, Brown argues that the circuit court’s reasonable-doubt instructions were unconstitutional and violated the United States Supreme Court’s holding in
 
 Cage v. Louisiana,
 
 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because, he argues, they allowed the jury to convict on a standard of proof less than reasonable doubt.
 

 The United States Supreme Court in
 
 Cage
 
 held that the use of the following three terms when defining reasonable doubt lessened the State’s burden of proof: actual substantial doubt, moral certainty, and grave uncertainty.
 

 In this case, the circuit court gave the following instruction, in pertinent part, on reasonable doubt:
 

 “I told you that you must be satisfied beyond a reasonable doubt. And that means just what it says. A reasonable doubt is a doubt for which you can give a good, sensible reason. It does not mean a mere possible doubt, an imaginary doubt, or a speculative doubt. And when we say the burden is on the Sate to convince you beyond a reasonable doubt of the guilt of the defendant, that
 
 *916
 
 does not mean that the Sate must convince you to a mathematical certainty. That could never be done when you rely on the testimony of other human beings. Reasonable doubt may arise from all of the evidence, a lack of evidence, or from any part of the evidence.”
 

 (R. 617-18.) We approved of an almost identical jury instruction on reasonable doubt in
 
 Reuther v. City of Leeds,
 
 599 So.2d 1246, 1250 (Ala.Crim.App.1992). The instruction was not misleading or erroneous and did not constitute error, much less plain error.
 

 C.
 

 Third, Brown argues that the circuit court failed to instruct the jury on all the elements of the charges against him. Specifically, he argues in brief:
 

 “The trial court’s failure to instruct the jury that the State had to prove that Mr. Brown was armed with a deadly weapon, and that the deadly weapon had to be a knife, allowed the jury to convict Mr. Brown of capital murder even if [it] concluded that the deadly weapon used in this case was not the knife, but that the deadly weapon was the defendant’s hands.”
 

 (Brown’s brief at pages 65-66.)
 

 During the jury instructions the circuit court read the indictment to the jury. The indictment alleged that the acts were committed while Brown was armed with a knife. The court then instructed the jury that to commit the offense Brown had to have been armed with a deadly weapon. The court then defined a deadly weapon. The court did not fail to instruct the jury on all of the elements of the burglary offense. Therefore, we find no plain error.
 

 D.
 

 Fourth, Brown argues that the court erred in failing to repeat in its general jury instructions certain cautionary instructions relating to some of the evidence introduced by the State.
 

 The record shows that after the attorneys gave their opening statements the circuit court instructed the jury that the jury was to decide whether Brown’s statement was voluntary, that the admission of some photographs was not to prejudice Brown, and that the jury should not let passion or prejudice affect its verdict. Brown requested that the circuit court give these instructions; however, he did not request that these same instructions be repeated during the court’s general jury instructions.
 

 The trial court did not commit error, much less plain error, in failing to sua sponte repeat the above cautionary instructions in its general instructions to the jury.
 

 E.
 

 Fifth, Brown argues that the circuit court’s instructions on the presumption of innocence were flawed and suggested that the jury would find Brown guilty.
 

 The court gave the following instruction:
 

 “I will charge you on some fundamental principles of law, the first one being the presumption
 
 of
 
 innocence. A fundamental principle of our system of criminal law is that a defendant is presumed to be innocent. The mere fact that he’s charged with crimes is not evidence of his guilt. Furthermore, a defendant is presumed to remain innocent throughout the trial unless
 
 and until
 
 you conclude, based upon careful and impartial consideration of the evidence, that the State has proven him guilty beyond a reasonable doubt of the charged made against him.
 

 “It is not the defendant’s burden to prove he is not guilty. Instead, it is the
 
 *917
 
 State that always has the burden of proving each and every element of the crimes charged and that the defendant is guilty of those crimes beyond a reasonable doubt.
 

 “A person accused of a crime is not required to present evidence or to prove anything in his own defense. If the evidence presented fails to meet the State’s burden, then your verdict must be not guilty. On the other hand, if the evidence does prove beyond a reasonable doubt that the defendant is guilty of the crimes charged, then your verdict should be guilty.”
 

 (R. 602-03) (emphasis added). Brown argues that the emphasized portion of the above instruction informed the jury that the court expected it to return a guilty verdict.
 

 This instruction on the presumption of innocence was not misleading and did not constitute plain error. See
 
 Ex parte Sla-ton,
 
 680 So.2d 909, 927 (Ala.1996) (“The instructions clearly informed the jury that,
 
 unless and until
 
 the State proved at least one aggravating circumstance beyond a reasonable doubt, the jury could not even consider sentencing Slaton to death.”);
 
 Ex parte Marek,
 
 556 So.2d 375 (AIa.1989) (approved use of “unless and until” as it related to a presumption of innocence instruction). Therefore, we find no plain error.
 

 Penalty-Phase Issues
 

 XVIII.
 

 Brown argues that the prosecutor committed reversible error in several of his arguments during the penalty phase of his capital trial.
 

 As we have previously stated:
 

 “ ‘ “The relevant question is whether the prosecutor’s comments ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ”
 
 Darden v. Wainwright,
 
 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting
 
 Donnelly v. DeChristoforo,
 
 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial.
 
 Duren v. State,
 
 590 So.2d 360, 364 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).’ ”
 

 Bonner v. State,
 
 921 So.2d 469, 473 (Ala.Crim.App.2005), quoting
 
 Simmons v. State,
 
 797 So.2d 1134, 1162 (Ala.Crim.App.1999).
 

 There were no objections made to any of the challenged instances of alleged misconduct; therefore, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
 

 A.
 

 First, Brown argues that the prosecutor’s closing argument concerning the application of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses was not supported by the evidence and was error.
 

 He challenges the following argument:
 

 “When Betty Kirkpatrick opens that door, Michael Brown’s hands greet her throat. As he squeezes the life out of her, is it cruel as she looked him in the eye, as he tightened his grip around her throat, she thought what is going on, as the grip tightened and she lost consciousness, not knowing what was going to happen next. ...
 

 [[Image here]]
 

 “Michael Brown had her on the ground. She had lost consciousness and wasn’t breathing anymore. He could get what he wanted; he could get her purse, her car, her jewelry. Leave her alone and
 
 *918
 
 who knows, maybe the life would have just jumped back into her. Maybe she would have gasped and caught her breath again. But Michael Brown wanted to make sure that wouldn’t happen. So he goes to the kitchen, and he cuts her throat and ends her life.”
 

 (R. 705-07.) These comments all related to matters that were in evidence or to matters that could reasonably be inferred or drawn from the evidence that had been presented at trial.
 

 “In view of the testimony and evidence presented before the jury, this Court does not consider the district attorney’s explanation unreasonable as being beyond the bounds of legitimate argument. Although counsel has ‘no right to create evidence by his argument,’
 
 Davis v. State,
 
 49 Ala.App. 587, 590, 274 So.2d 360, 363 (1972), cert. denied, 290 Ala. 364, 274 So.2d 363 (1973), ‘counsel may draw any inference which the facts tend to support.’
 
 Brothers v. State,
 
 236 Ala. 448, 452, 183 So. 433, 436 (1938). ‘Counsel for the state and defendant are allowed a rather wide latitude in drawing their deductions from the evidence.’
 
 Arant v. State,
 
 232 Ala. 275, 279, 167 So. 540, 543 (1936). ‘Counsel has a right to argue any reasonable inference from the evidence or lack of evidence ... and to draw conclusions from the evidence based on their own reasoning.’
 
 Roberts v. State,
 
 346 So.2d 473, 476 (Ala.Cr.App.), cert. denied, 346 So.2d 478 (Ala. 1977). ‘Trial judges ordinarily are loath to limit inferential argument which has any connection with the evidence even though far-fetched.... So long as counsel does not travel out of his case and confines statements to reasonable inferences deducible from the evidence, he should not be controlled.’
 
 Roberts,
 
 346 So.2d at 477. ‘[I]t would be dangerous to accord to the presiding judge the right and power to intervene, and declare authoritatively when an inference of counsel is or is not legitimately drawn. This is for the jury to determine, if there be any testimony on which to base it.’
 
 Cross v. State,
 
 68 Ala. 476, 483 (1881).”
 

 Kuenzel v. State,
 
 577 So.2d 474, 493-94 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Accordingly, we find no plain error in the prosecutor’s argument.
 

 B.
 

 Second, Brown argues that the prosecution improperly compared the victim’s rights to those of the defendant. The prosecutor stated the following: “Did she deserve to die? Does he deserve to live?” (R. 691.)
 

 It is improper for a prosecutor to argue the victim’s rights and to compare those rights to the rights of the defendant. However, as we stated in
 
 McNair:
 

 “The prosecutor made numerous references to the victim’s rights and several times implied that her rights were to be weighed against the appellant’s. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict. See
 
 Duren v. State,
 
 590 So.2d 360, 364 (Ala.Cr.App.1990), affirmed, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992);
 
 Bankhead v. State,
 
 585 So.2d 97, 106 (Ala.Cr.App.1989), affirmed as to instant issue and remanded on other grounds, 585 So.2d 112 (Ala.1991) (on rehearing), affirmed on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992);
 
 Harris v. State,
 
 539 So.2d 1117, 1123 (Ala.Cr.App.1988).”
 

 
 *919
 
 653 So.2d at 337-38. See also
 
 Calhoun v. State,
 
 932 So.2d 923 (Ala.Crim.App.2005), cert. denied, 548 U.S. 926, 126 S.Ct. 2984, 165 L.Ed.2d 990 (2006) (no reversible error when prosecutor commented that the defendant’s mother got to plead for his life but that the victim’s mother did not get to plead for her son’s life);
 
 Lewis v. State,
 
 889 So.2d 623 (Ala.Crim.App.2003) (no reversible error when prosecutor argued that jury should consider the rights of the people living in the county in which the victim lived);
 
 Johnson v. State,
 
 820 So.2d 842 (Ala.Crim.App.2000), aff'd, 820 So.2d 883 (Ala.2001), cert. denied, 535 U.S. 1058, 122 S.Ct. 1921, 152 L.Ed.2d 828 (2002) (no reversible error when prosecutor argued that it was not fair to the victim because she did not get a two-week trial like the defendant). For the reasons stated in
 
 McNair,
 
 we find no plain error.
 

 C.
 

 Third, Brown argues that the prosecutor improperly denigrated the role of mitigating evidence. The prosecutor made the following argument:
 

 “What is the law? The Judge told you what we do in this case is we, reaching this phase of the proceeding, weigh aggravating circumstances versus mitigating circumstances. And you decide what weight to apply to each circumstance, aggravating and mitigating. And then you weigh it, and then you decide what the appropriate punishment should be. Now we — in this phase, we don’t look to — and I’m serious about this — we don’t look to prejudice, we don’t look — we are not going to stand here and go monster, monster, monster. Think about the family and what Ms. Kirkpatrick went through. We apply the law to the facts. And why is that important? Because we do it every day in this courthouse. If we don’t apply the law to the facts, if we don’t weigh the aggravating and mitigation, then what happens in this case? We just want to say, ‘Well, listen, the momma testified, and I’m going to cut Michael Brown a break without really weighing the aggravating and mitigating circumstances.’
 

 “What happens the next time a fellow is sitting over there charged with capital murder, and he’s convicted, and he’s looking down the barrel of the jury, and that jury decides to apply the law to him. We can’t do that. We have to apply the law. And wherever it is the law takes us is where we land. If the law takes us and takes you back in that jury room to a recommendation of life without parole, that is where the law takes us. If the law takes us to a recommendation of death for Michael Brown, then that is where the law will take us, and we will go.”
 

 (R. 698-700.)
 

 We do not agree with Brown’s assessment of the above argument. This argument did not denigrate the mitigating evidence but instead urged the jury to follow the law as instructed by the court. Accordingly, we find no plain error.
 

 D.
 

 Fourth, Brown argues that the prosecutor diminished the jury’s responsibility by referring to its verdict in the penalty phase as a recommendation.
 

 “Alabama courts have repeatedly held that a prosecutor’s comments and a trial court’s instructions accurately informing a jury that its sentencing verdict is advisory or is a recommendation do not violate
 
 Caldwell [v. Mississippi,
 
 472 U.S. 320 (1985)].
 
 E.g., Ray v. State,
 
 809 So.2d 875, 883 (Ala.Crim.App.2001), and cases cited therein.”
 

 
 *920
 

 Deardorff v. State,
 
 6 So.3d 1205, 1233 (Ala.Crim.App.2004). Therefore, we find no plain error.
 

 E.
 

 Last, Brown argues that the cumulative effect of the instances of alleged prosecuto-rial misconduct mandates reversal. Our review of the record convinces us that the cumulative effect of the alleged instances of misconduct did not affect Brown’s substantial rights. See
 
 Ex parte Tomlin,
 
 540 So.2d 668 (Ala.1988).
 

 XIX.
 

 Brown next argues that the circuit court’s jury instructions in the penalty phase were erroneous- for a number of different reasons. We use the standard of review set out by this Court in Part XVII of this opinion.
 

 There were no objections made to any of the challenged instructions; therefore, we review these claims for plain error. See Rule 45A, Ala.R.App.P.
 

 A.
 

 First, Brown argues that it was error for the circuit court to refer to its earlier instructions concerning reasonable doubt that it had given in the guilt phase earlier that same day and not to give a new instruction on reasonable doubt in the penalty phase.
 

 As we stated in
 
 Griffin v. State,
 
 790 So.2d 267, 338 (Ala.Crim.App.1999):
 

 “While we do not wish to be seen as approving the practice during the penalty phase of merely referring to instructions previously given during the guilt phase of a capital murder trial, we conclude that in this case the trial court’s reference during the sentencing phase to its previous instruction on reasonable doubt without explicitly instructing on reasonable doubt was not plain error.
 

 “The trial court gave a detailed definition of reasonable doubt during the guilt phase at approximately 5:00 p.m. and then referenced his instruction the following morning at approximately 11:00 a.m. Only a short time — less than 24 hours — lapsed between the instructions. Additionally, the trial court asked the jury if it needed to reinstruct on reasonable doubt and no one indicated that he did not remember the previous instruction. ‘ “It is assumed that the jury will consider the previously given instructions along with those given in the supplemental charge.” ’
 
 Collins v. State,
 
 611 So.2d 498, 503 (Ala.Cr.App.1992), quoting
 
 Brannon v. State,
 
 549 So.2d 532, [541-42] (Ala.Cr.App.1989), quoting
 
 Davis v. State,
 
 440 So.2d 1191, 1195 (Ala.Cr.App.1983), cert. denied, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984).
 

 “Moreover, we find it significant that the instruction on reasonable doubt during the sentencing phase was only applicable, as the trial court instructed, to the finding of the existence of the aggravating circumstances. Reasonable doubt is the state’s burden of proof in establishing the aggravating circumstances. Because the jury found Griffin guilty of capital murder, the aggravating circumstance that the murder was committed for pecuniary gain was established as a matter of law.”
 

 See also
 
 Johnson v. State,
 
 820 So.2d 842, 876 (Ala.Crim.App.2000), aff'd, 820 So.2d 883 (Ala.2001), cert. denied, 535 U.S. 1058, 122 S.Ct. 1921, 152 L.Ed.2d 828 (2002);
 
 Broadnax v. State,
 
 825 So.2d 134, 218 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002);
 
 Smith v. State,
 
 795 So.2d 788, 837 (Ala.Crim.App.2000),
 
 *921
 
 cert. denied, 795 So.2d 842 (Ala.), cert. denied, 534 U.S. 872, 122 S.Ct. 166, 151 L.Ed.2d 113 (2001). For the reasons stated in
 
 Johnson,
 
 we find no plain error.
 

 B.
 

 Second, Brown argues that the circuit court’s instruction allowed the jury to believe that it could not consider mercy in determining its penalty-phase verdict. The court gave the following instruction:
 

 “In reaching your finding concerning the aggravating and mitigating circumstances in this case and in determining what the punishment in this case should be, you must avoid any influence of passion, prejudice, or any other arbitrary factor. Your deliberation and verdict must be based on the evidence you have seen and heard and the law on which I have instructed you. There is no room for the influence of passion, prejudice, or any other arbitrary factor.”
 

 (R. 718-19.)
 

 “Contrary to Perkins’s contention, it is well settled in Alabama that ‘[a] capital defendant is not automatically entitled to a mercy instruction.’
 
 Boyd v. State,
 
 715 So.2d 825, 846 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998). See also,
 
 Taylor v. State,
 
 666 So.2d 36 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996);
 
 Rieber v. State,
 
 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995). In
 
 Kuenzel v. State,
 
 577 So.2d 474, 495 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), this court stated that ‘[t]he Alabama provisions for the imposition of capital punishment nowhere mention mercy.’ Here, the trial court instructed the jury that its verdict should be based only on the evidence presented and the law as instructed by the court. The jury was instructed that it ‘must avoid any influence of passion, prejudice or any other arbitrary factor.’ (R. 3007-08.) In
 
 California v. Brown,
 
 479 U.S. 538, 539, 107 S.Ct. 837, 838, 93 L.Ed.2d 934 (1987), the United States Supreme Court held that ‘an instruction informing jurors that they “must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling” during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution.’ ”
 

 Perkins v. State,
 
 808 So.2d 1041, 1134-35 (Ala.Crim.App.1999), vacated on other grounds,
 
 Perkins v. Alabama,
 
 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). For the above reasons, we find no plain error.
 

 C.
 

 Third, Brown argues that the circuit court failed to instruct the jury that it must find the existence of good character evidence because this evidence was presented and not disputed by the State.
 

 However, the court did instruct the jury as follows:
 

 “The law of our state provides a list of some of the mitigating circumstances that you shall consider, but that list is not a complete list of mitigating circumstances that you may consider.
 

 [[Image here]]
 

 “In addition to the mitigating circumstances I have read to you, let me emphasize that mitigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that
 
 *922
 
 the defendant offers that is a basis for a sentence of life imprisonment without parole instead of death.
 

 “A mitigating circumstance considered by you should be based on the evidence you have heard. However, a mitigating circumstance does not have to be proved beyond a reasonable doubt like an aggravating circumstance does.
 

 “When a factual existence of any offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of the circumstance by a preponderance of the evidence. A burden of disproving a circumstance by a preponderance of the evidence means that you are to consider that the mitigating circumstance does exist, unless taking the evidence as a whole, it is more likely than not the mitigating circumstance does not exist.”
 

 (R. 715-16.) The circuit court instructed the jury that mitigating evidence was any evidence of the defendant’s character or the circumstances of the offense that the defendant offered. We approved of a substantially similar instruction in
 
 Simmons v. State,
 
 797 So.2d 1134, 1174 (Ala.Crim.App.1999). Therefore, we find no plain error.
 

 D.
 

 Fourth, Brown argues that the court did not instruct the jury that it had to unanimously agree “that one and the same aggravating circumstance had been proved beyond a reasonable doubt before proceeding to consider mitigating circumstances.” (Brown’s brief at page 71.)
 

 However, the court gave the following instruction:
 

 “When I instructed you regarding aggravating circumstances, I told you that all 12 of you must unanimously agree upon the existence of aggravating circumstances before you can — before you can — wait—before you can consider
 
 that
 
 aggravating circumstance has been proven.”
 

 The record shows that the court did give this instruction. Thus, Brown’s assertion is not supported by the record.
 

 E.
 

 Fifth, Brown argues that the circuit court’s insti’uctions on the heinous, atrocious, or cruel aggravating circumstance were vague because, he argues, the instructions gave the jury no guidance as to when to apply this aggravating circumstance.
 

 The Alabama Supreme Court in
 
 Ex parte Clark,
 
 728 So.2d 1126 (Ala.1998), stated:
 

 “The Supreme Court has held that the ‘especially heinous, atrocious, or cruel’ aggravating circumstance provides such a principled distinction only where the state appellate courts employ a consistent and narrow interpretation of that circumstance to channel the discretion of the sentencer. See
 
 [Maynard v.] Cartwright,
 
 486 U.S. [356] at 365-66, 108 S.Ct. 1853 [ (1988) ] (upholding the Oklahoma Court of Criminal Appeals’ interpretation of the ‘especially heinous, atrocious, or cruel’ aggravating circumstance to require, before a death sentence is imposed, a finding that the victim was tortured or was caused to suffer serious physical abuse).
 

 “In
 
 Lindsey v. Thigpen,
 
 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court’s application of the ‘especially heinous, atrocious or cruel’ aggravating circumstance because this Court’s application of it provided a ‘principled way to distinguish’ cases in which the death penalty is appropriately imposed from cases in which it is not.
 
 Id.
 
 at 1513, 1515 (upholding our application of
 
 *923
 
 Ala.Code 1975, § 13A-5-49(8) and quoting
 
 Godfrey [v. Georgia],
 
 446 U.S. [420] at 431, 100 S.Ct. 1759 [ (1980) ]). The Eleventh Circuit emphasized that the Alabama appellate courts’ interpretation of § 13A-5At9(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined ‘especially heinous, atrocious or cruel’ to include only ‘those conscienceless or pitiless homicides which are
 
 unnecessarily torturous
 
 to the victim.’
 
 Lindsey v. Thigpen,
 
 at 1514 (quoting
 
 Ex parte Kyzer,
 
 399 So.2d 330, 334 (Ala.1981)) (emphasis added).”
 

 728 So.2d at 1138 (footnote omitted).
 

 Here, the circuit court gave the following instruction, in part:
 

 “The State contends the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Let me give you some definitions or instructions as to what those terms mean.
 

 “We are talking about the one particularly that is — that contend that the offense was particularly heinous, atrocious, or cruel as compared to other capital offenses, was intended to apply only to those conscienceless or pitiless homicides which are unnecessarily torturous for the victim. Heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked or vile; cruel means designed to inflict a high degree of pain with utter indifference to the suffering of others.
 

 “And you will notice that this is compared to other capital offenses. You are not comparing conduct you find in this case to the norms of society, but in comparison to other capital offenses, serious crimes, capital crimes, and limited to that.”
 

 (R. 711-12.)
 

 In addressing the validity of a similar instruction this Court in
 
 Haney v. State,
 
 603 So.2d 368, 386 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993), stated:
 

 “These instructions were proper and furnished adequate guidance to the jury. The court’s instructions that this aggravating circumstance should apply to the conscienceless or pitiless crime which is unnecessarily [torturous] to the victim and one in which the brutality exceeds that which is normally present in any capital offense met the requirements of law. See
 
 Proffitt v. Florida,
 
 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976);
 
 Ex parte Kyzer,
 
 399 So.2d 330 (Ala.1981);
 
 Hallford v. State,
 
 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).”
 

 For the foregoing reasons, we find no plain error in the circuit court’s instruction on this aggravating circumstance.
 

 F.
 

 Sixth, Brown argues that the court improperly instructed the jury that its verdict in the penalty phase was a recommendation. It cites the case of
 
 Ex parte McGriff,
 
 908 So.2d 1024 (Ala.2004), in support of its contention that this reference constituted reversible error.
 

 The Alabama Supreme Court in
 
 McGriff,
 
 stated:
 

 “At no time during a retrial of the charge against McGriff should the jury be told that its decision on the issue of whether the proffered aggravating circumstance exists is ‘advisory’ or ‘recommending.’ Rather, the jury should be
 
 *924
 
 instructed that, if it determines that the aggravating circumstance does not exist, the jury must return a verdict, binding on the trial court, assessing life imprisonment without the possibility of parole as the penalty.”
 

 908 So.2d at 1038. The Supreme Court made this statement in
 
 McGriff
 
 because there was no corresponding element of the capital offense that was also an aggravating circumstance that would elevate McGriffs penalty to death. In
 
 McGriff,
 
 the capital offense was murder committed by the use of a deadly weapon from a vehicle. There is no aggravating circumstance that corresponds to any element of that capital offense.
 

 In this case, however, the jury had already found beyond a reasonable doubt that Brown committed the murder during the course of a robbery and a burglary, both aggravating circumstances that would support a sentence of death. The jury’s verdict at the guilt phase made Brown eligible for the death penalty. Accordingly, there is no violation of the Supreme Court’s holding in
 
 McGriff.
 
 See
 
 Black-mon v. State,
 
 supra.
 

 G.
 

 Seventh, Brown argues that the court’s jury instructions were erroneous and in violation of
 
 Ex parte Bryant,
 
 951 So.2d 724 (Ala.2002), because the circuit court failed to instruct the jury what to do if it found that the aggravating and the mitigating circumstances were equal in weight.
 

 The Alabama Supreme Court in
 
 Bryant,
 
 in finding that the jury instructions on the weighing process amounted to plain error, stated:
 

 “In the case now before us, the jury instructions erroneously allow the conclusion that the death penalty is appropriate
 
 even if the aggravating circumstances do not outweigh the mitigating circumstances
 
 so long as the mitigating circumstances
 
 do not outweigh
 
 the aggravating circumstances. The trial judge in this case did not add the caveat which sufficed in
 
 [Ex parte] Trawick,
 
 [698 So.2d 162 (Ala.1997)], that the jury was to ‘recommend the death penalty
 
 only
 
 if [the jury] found that the aggravating circumstances outweighed the mitigating circumstances.’
 
 Trawick,
 
 698 So.2d at 173. Indeed, at the end of the instructions on this topic, the trial judge implicitly told the jury that it might recommend death
 
 even if the jury did not find an aggravating circumstance at all:
 
 ‘if you do
 
 not
 
 find that an alleged aggravating circumstance was proved, that does not
 
 automatically
 
 or
 
 necessarily
 
 mean that you should sentence Mr. Bryant to death....’ (R. 1103, quoted
 
 supra.)
 
 (Emphasis added.)
 

 “No other instructions by the trial court and no other feature of the record instills us with any confidence that the jury did not, within the parameters of the erroneous instructions, base the death penalty recommendation
 
 on a finding
 
 that the mitigating circumstances did not outweigh the aggravating circumstances even though the mitigating circumstances
 
 did equal
 
 the aggravating circumstances. Such a recommendation would be contrary to § 13A-5-46(e). Therefore, the erroneous jury instructions on the topic of weighing the aggravating circumstances and the mitigating circumstances constitute plain error.”
 

 Bryant v. State,
 
 951 So.2d at 730.
 

 Subsequently, in
 
 Ex parte McNabb,
 
 887 So.2d 998 (Ala.2004), the Alabama Supreme Court further explained its holding in
 
 Bryant,
 
 by stating:
 

 “The charge in this case was not infected with the peculiar error present in
 
 Bryant,
 
 that is, the jury in this case was
 
 *925
 
 not invited to recommend a sentence of death without finding any aggravating circumstance. It was that invitation in
 
 Bryant
 
 that caused the error in that case to rise to the level of plain error, rather than error reversible only by a proper objection. Thus, in this case, although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error ‘seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,’
 
 Ex parte Davis,
 
 718 So.2d at 1173-74, so as to require a reversal of the sentence.”
 

 887 So.2d at 1004.
 

 Here, the circuit court gave the following instruction:
 

 “Now, ladies and gentlemen, after fair and full consideration of all of the evidence, if you are convinced beyond a reasonable doubt that the aggravating circumstances I have charged you on do, in fact, exist and at least ten of you agree that the aggravating circumstances outweigh the mitigating circumstances, then your verdict would be death, and your foreperson would sign the appropriate place on the box and insert the count as I requested.
 

 “If after full and fair consideration of all of the evidence, you are not convinced beyond a reasonable doubt that the aggravating circumstances exist, or at least if you agree that — or at least seven of you agree that the mitigating circumstances outweigh the aggravating circumstances, your verdict would be life without parole, and the foreperson would sign the appropriate place and indicate the count.”
 

 (R. 721-22.) Both the Alabama Supreme Court and this Court have relied on the holding in
 
 McNabb
 
 to affirm jury instructions similar to the ones given in this case. See, e.g.,
 
 Ex parte Walker,
 
 972 So.2d 737 (Ala.2007);
 
 Blackmon v. State,
 
 supra;
 
 Calhoun v. State,
 
 supra. The Court’s jury instruction on the weighing process did not violate the Supreme Court’s holding in
 
 Bryant.
 
 For these reasons we find no plain error.
 

 XX.
 

 Brown argues that the State did not present sufficient evidence to support the application of the aggravating circumstance that Brown had previously been convicted of a “felony involving the use or threat of violence to the person,” as set out in § 13A-5-49(2), Ala.Code 1975. Specifically, he argues that it was error to allow the jury to consider his prior conviction for attempted rape in the first degree because there were no facts presented to show that this crime was a crime of violence.
 

 According to § 13A-5-45(e), Ala. Code 1975, the State has the burden of proving beyond a reasonable doubt the existence of any aggravating circumstance. Here, at the sentencing hearing, the State presented certified copies of two of Brown’s prior convictions, one for robbery in the first degree and one for attempted rape in the first degree. The indictment for the robbery charge was also introduced. The indictment alleges that Brown took the property of Johnnie Sue Neel by force at gunpoint. Clearly, the State met its burden of showing that this prior conviction was for a crime of violence.
 

 However, the case-action-summary sheet for Brown’s prior conviction for attempted rape in the first degree does not detail any facts surrounding that conviction. Nor was there any testimony at the penalty phase concerning the facts of this offense. Rape in the first degree may be by forcing a member of the opposite sex to have sexual intercourse, by engaging in
 
 *926
 
 sexual intercourse with an individual who is incapable of consenting, or by engaging in sexual intercourse with an individual who is less than 12 years of age. See § 13A-6-61, Ala.Code 1975. Here, there was no evidence that the prior conviction was attempted rape by “forcible compulsion.” See § 13A-6-61, Ala.Code 1975.
 

 Nonetheless, the State met its burden of showing that Brown had a prior conviction for robbery in the first degree and that that conviction was for a violent felony; accordingly, this aggravating circumstance was correctly presented to the jury and found to exist. Therefore, we are confident that any possible error that might have occurred here was harmless beyond a reasonable doubt. See
 
 Chapman v. California,
 
 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The harmless-error rule has been applied to the penalty phase of a capital case. See
 
 Ex parte Whisenhant,
 
 482 So.2d 1241 (Ala.1983).
 

 XXI.
 

 Brown argues that his death sentence violates the United States Supreme Court’s holding in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In
 
 Apprendi v. New Jersey,
 
 530 U.S. 466 (2000), the United State Supreme Court held that any fact that increases a penalty above the statutory maximum must be presented to a jury and proved beyond a reasonable doubt. This holding was extended to death-penalty cases in
 
 Ring v. Arizona.
 

 Here, the jury convicted Brown of murdering Betty Kirkpatrick during the course of a robbery and a burglary.
 

 “In
 
 Stallworth v. State,
 
 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to remand), we held that if the aggravating circumstance that elevated the punishment to death was also an element of the capital offense,
 
 Apprendi
 
 was not violated because the jury’s verdict in the guilt phase found that fact to exist beyond a reasonable doubt.”
 

 Blackmon v. State,
 
 7 So.3d at 417. Accordingly, there is no
 
 Ring
 
 violation here.
 

 Brown further argues that there is no basis for upholding the death penalty because. the jurors did not complete verdict forms concerning the aggravating circumstances that it found to exist. He cites
 
 Ex parte McGriff,
 
 908 So.2d 1024 (Ala.2004), in support of his argument.
 

 The Alabama Supreme Court in
 
 McGriff
 
 endorsed the use of penalty-phase special interrogatories that detail the aggravating circumstances the penalty-phase jury found to exist or to not exist. In this case, Brown was tried and convicted before
 
 McGriff
 
 was decided. Therefore, there is no violation of the Alabama Supreme Court’s decision in
 
 McGriff.
 

 Brown further argues that according to
 
 Apprendi v. New Jersey,
 
 the aggravating circumstances should have been alleged in the indictment. We rejected a similar argument in
 
 Stallworth v. State,
 
 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to second remand), 868 So.2d 1189 (Ala.), cert. denied, 540 U.S. 1057, 124 S.Ct. 828, 157 L.Ed.2d 711 (2003), where we stated:
 

 “In
 
 Poole v. State,
 
 846 So.2d 370 (Ala.Crim.App.2001), we held that, although
 
 Apprendi [v. New Jersey,
 
 530 U.S. 466 (2000),] required that the facts that increased a sentence above the statutory maximum must be submitted to a jury, those facts did not have to be alleged in the indictment. Recently, the Alabama Supreme Court adopted our holding in
 
 Poole.
 
 See
 
 Hale v. State,
 
 848 So.2d 224 (Ala.2002).
 

 “Also, the holdings in
 
 Poole
 
 and
 
 Hale
 
 are consistent with prior caselaw, which
 
 *927
 
 holds that aggravating circumstances do not have to be alleged in the indictment. See
 
 Ex parte Lewis,
 
 811 So.2d 485 (Ala.2001), and
 
 Dobard v. State,
 
 435 So.2d 1338 (Ala.Crim.App.1982).”
 

 868 So.2d at 1186.
 
 [12]
 

 XXII.
 

 Brown further argues that his sentence of death by lethal injection is cruel and unusual punishment in violation of the Eighth Amendment because, he argues, revolving standards of decency have rendered lethal injection unconstitutional. Brown makes no individual claim that as applied to him lethal injection is cruel and unusual.
 

 In
 
 Bryant v. State,
 
 951 So.2d 732, 747-48 (Ala.Crim.App.2005) (opinion on return to remand), we stated:
 

 “We note that Alabama’s statutory death-penalty scheme has repeatedly been upheld against constitutional challenges. A comprehensive listing of the cases dealing with these challenges can be found in
 
 Travis v. State,
 
 776 So.2d 819, 873 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001). Moreover, we know of no authority in support of the general proposition that death by lethal injection violates a defendant’s constitutional rights. Indeed, a number of jurisdictions have rejected such claims. See, e.g.,
 
 Sims v. State,
 
 754 So.2d 657, 668 (Fla.2000);
 
 State v. Carter,
 
 89 Ohio St.3d 593, 608, 734 N.E.2d 345 (2000);
 
 Ritchie v. State,
 
 809 N.E.2d 258, 262 (Ind.2004);
 
 Wheeler v. Commonwealth,
 
 121 S.W.3d 173, 186 (Ky.2003).3 Today, we join these jurisdictions in holding that death by lethal injection is not per se cruel and unusual punishment.
 

 [[Image here]]
 

 “3 Indeed, the only case we know of successfully challenging execution by lethal injection involved an inmate’s individualized claim that death by lethal injection would violate the Eighth Amendment’s prohibition against cruel and unusual punishment because he suffered from collapsed veins. See
 
 Nelson v. Campbell,
 
 541 U.S. 637, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004). Bryant makes no such individualized claim. Thus, he is entitled to no relief on his claim that death by lethal injection constitutes cruel and unusual punishment.”
 

 Since this Court released its decision in
 
 Bryant,
 
 one California court has held that lethal injection “as actually administered in practice” constitutes cruel and unusual punishment. See
 
 Morales v. Tilton,
 
 465 F.Supp.2d 972, 974 (N.D.Cal.2006). We have been cited to no reason to depart from our holding in
 
 Bryant.
 

 Trial Court’s Sentencing Order
 

 XXIII.
 

 Brown argues that the circuit court improperly applied the aggravating circumstance that the murder was especially heinous, atrocious, or cruel as compared to other capital murders.
 

 The circuit court stated the following in its sentencing order:
 

 “The especially heinous, atrocious, and cruel aggravating circumstance was well established in that the victim Betty Kirkpatrick was brutally murdered in her own home. She was strangled, as is evidenced by the bruising and apparently did not die immediately and the defendant ties a plastic bag so tightly
 
 *928
 
 around her neck that a finger could not be inserted between the bag and the neck. The coroner believed she died of asphyxiation, but apparently the defendant was not convinced of her demise and slit her throat.”
 

 (C.R. 197.)
 

 The coroner testified that Betty Kirkpatrick had been assaulted, that she had bruises on her face and hands that were caused by blunt force, that there was evidence of strangulation, and that she had been asphyxiated to death. A plastic bag had been tied around her head so tightly, he said, that he could not put a finger between the bag and her neck. He further stated:
 

 “When a person is — dies of asphyxia or when they are strangled, sometimes— often, in fact, there will be a breakdown of the tiny blood vessels and blood will leak out of those tiny blood vessels, the capillaries. And that’s particularly easy to see on undersides of the eyelids because the vessels are so close to the surface.”
 

 (R. 424.) The coroner said that the victim’s eyelids showed broken blood vessels consistent with strangulation. It was also his opinion that Betty Kirkpatrick was not breathing when her throat was cut.
 

 As we stated in
 
 Brown v. State,
 
 982 So.2d 565 (Ala.Crim.App.2006):
 

 “The amount of violence used against Mrs. Keel, a frail and elderly lady, was excessive. See
 
 Scott v. State,
 
 [937 So.2d 1065 (Ala.Crim.App.2005) ] (holding that the strangulation and suffocation death of a 10-year-old victim was particularly heinous, atrocious, and cruel compared to other capital offenses);
 
 Ward v. State,
 
 814 So.2d 899, 923-24 (Ala.Crim.App.2000) (holding that the suffocation death of an abused child was especially heinous, atrocious, or cruel compared to other capital offenses);
 
 Singleton v. State,
 
 465 So.2d 432 (Ala.Crim.App.1983), aff'd, 465 So.2d 443 (Ala.1985) (holding that the intentional murder of a nun, who had been bound by the hands and feet with her own shoelaces and strangled with a knotted strip of towel wrapped and twisted around her neck, before being buried under a pile of rocks, was especially heinous, atrocious, or cruel).”
 

 982 So.2d at 607.
 

 Clearly, in this case, the amount of force used to murder Betty Kirkpatrick, a 65-year-old woman, was excessive by any standard. Accordingly, we find no plain error in the circuit court’s application of this aggravating circumstance to the heinous facts presented in this case.
 

 XXIV.
 

 Brown further argues that the court erred in relying on the allegedly prejudicial presentence report. He asserts that the report is not complete and that this admission denied him “consideration of the full mosaic of [his] background and circumstances before determining the proper sentence.” He relies on the case of
 
 Guthrie v. State,
 
 689 So.2d 935 (Ala.Crim.App.1996), in support of this argument.
 

 There was no objection made to the presentence report in this case; therefore, we are limited to determining whether there is plain error. See Rule 45A, Ala. RApp.P.
 

 In
 
 Wilson v. State, 777
 
 So.2d 856 (Ala.Crim.App.1999), aff'd, 7
 
 77
 
 So.2d 935 (Ala. 2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001), we stated the following about our decision in
 
 Guthrie:
 

 “In
 
 Guthrie,
 
 we were concerned because the appellant did not present any mitigating evidence diming the sentencing hearings before the jury and the trial
 
 *929
 
 court; the appellant’s personal and social history had been taken from an interview that was conducted at least five years before his sentencing hearing; the ‘Evaluation of Offender’ section did not contain any information; and, although the report indicated that no psychological reports were available, it showed that the appellant had been incarcerated at Taylor Hardin Secure Mental Facility in 1988.”
 

 777 So.2d at 920.
 

 Unlike the presentence report in
 
 Guthrie,
 
 the report in this case was completed approximately one month before Brown was sentenced to death. In the “Evaluation of Offender” section, nothing appears under the heading “psychological reports.” However, there is no indication that Brown had any history of mental illness. Moreover, Brown’s mother and sister testified at the sentencing phase of the capital trial. Finally, in the order sentencing Brown to death the court found nonstatutory mitigating circumstances related to Brown’s background and upbringing. For these reasons, we find no plain error in the presentence report.
 

 XXV.
 

 Brown argues that the court erred in double counting robbery and burglary as both elements of the capital offenses and aggravating circumstances that would support a death sentence.
 

 “ ‘The practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as “double-counting” or “overlap” and is constitutionally permissible.’
 
 Coral v. State,
 
 628 So.2d 954, 965 (Ala.Cr.App.), aff'd on return to remand, 628 So.2d 988 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); see also
 
 Ex parte Trawick,
 
 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997); and
 
 Hart v. State,
 
 612 So.2d 520 (Ala.Cr.App.), aff'd, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). Section 13A-5-50, Ala.Code 1975, contemplates that certain aggravating circumstances will be considered established for purposes of sentencing when a verdict of guilty of capital murder is returned. That section specifically provides:
 

 “ ‘The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5^49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in Section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of Section 13A-5-40.’ ”
 

 Whitehead v. State, 777
 
 So.2d 781, 850 (Ala.Crim.App.1999), aff'd,
 
 777
 
 So.2d 854 (Ala.2000). There was no error here.
 

 Brown also argues that it was error for the court to use both burglary and robbery as two distinct and separate aggravating circumstances.
 

 “We specifically held in
 
 Stewart v. State,
 
 730 So.2d 1203 (Ala.Crim.App.1996) (opinion on second return to remand), aff'd, 730 So.2d 1246 (Ala.1999), that when there is proof that a murder occurred during the commission of two felonies enumerated in § 13A-5-49(4), Ala.Code 1975, both felonies may be considered two separate aggravating circumstances. We stated:
 

 
 *930
 
 “‘We hold that the aggravating circumstance enumerated in § 13A-5-49(4) may apply more than once if the accused murders another while committing any variation of the four enumerated felonies contained in § 13A-5-49(4), Code of Alabama 1975. The appellant committed the murder during the course of committing two felonies: burglary and kidnapping. The fact that § 13A-5-49(4) lists four different felonies under the single heading of aggravating circumstances does not mean that this circumstance could be applied only once in any given case. To hold otherwise would be to say that a person could commit a murder during the course of committing any number of the felonies enumerated in § 13A-5-49(4) and face no additional consequences at the penalty phase and in fact be considered to have committed only one of the felonies contained in this section. This was not the intent of the legislature. The legislature’s use of the word
 
 or
 
 in the above section supports this holding.’ ”
 

 Belisle v. State,
 
 11 So.3d at 321-22 (Ala.Crim.App.2007), quoting
 
 Stewart v. State,
 
 730 So.2d 1203, 1212 (Ala.Crim.App.1996) (opinion on second return to remand). Accordingly, we find no error.
 

 XXVI.
 

 Brown argues that the circuit court applied the wrong standard in evaluating mitigating circumstances because, he argues, in its sentencing order the court stated that “the mitigating circumstances need only be proven to their reasonable satisfaction.”
 

 Brown made no objection to the court’s sentencing order; therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 

 In the court’s findings of fact from the penalty phase the court wrote: “The Court further charged ... that the burden was on the State to prove the aggravating circumstances beyond a reasonable doubt, however, the mitigating circumstances need only be proven to them reasonable satisfaction.”
 

 “Of course, our law, § 13A-5-45(g), Ala.Code 1975, does not impose any burden on the defendant to prove mitigating circumstances to the jurors’ reasonable satisfaction. Rather, our law requires the jurors to consider any mitigating circumstance interjected by the defendant and not
 
 disproved
 
 by the State by a preponderance of the evidence. § 13A-5-45(g).
 
 See also Dill v. State,
 
 600 So.2d 343 (Ala.Crim.App.1991),
 
 aff'd,
 
 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).”
 

 Ex paHe Broadnax,
 
 825 So.2d 233, 238 (Ala.2001) (Johnstone, J., concurring in the result in part and dissenting in part).
 

 However, the circuit court correctly charged the jury as follows:
 

 “In addition to the mitigating circumstances I have read to you, let me emphasize that mitigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant offers that is a basis for a sentence of life imprisonment without parole instead of death.
 

 “A mitigating circumstance considered by you should be based on the evidence you have heard. However, a mitigating circumstance does not have to be proved beyond a reasonable doubt like an aggravating circumstance does.
 

 “When a factual existence of any offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of the
 
 *931
 
 circumstance by a preponderance of the evidence. A burden of disproving a circumstance by a preponderance of the evidence means that you are to consider that the mitigating circumstance does exist, unless taking the evidence as a whole, it is more likely than not the mitigating circumstance does not exist. Therefore, if there is a factual dispute over the existence of a mitigating circumstance, then you should find and consider that circumstance unless you find the evidence is that such — is such that it is more likely than not that the mitigating circumstance does not exist.”
 

 (R. 715-16.)
 

 The circuit court correctly charged the jury on the law but made a misstatement of the law in its sentencing order. As we stated in
 
 Pilley v. State,
 
 930 So.2d 550 (Ala.Crim.App.2005), cert. denied, 547 U.S. 1149, 126 S.Ct. 2288, 164 L.Ed.2d 817 (2006):
 

 “ ‘While the trial court’s sentencing order is defective, the errors are not so egregious or substantial as to require a new sentencing order. “The sole purpose of requiring that the trial judge, as the sentencing authority, make a written finding of the aggravating circumstance is to provide for appellate review of the sentence of death.”
 
 Ex paite Kyzer,
 
 399 So.2d 330, 338 (Ala.1981). “[T]he harmless error rule does apply in capital cases at the sentence hearing.”
 
 Ex paite Whisenhant,
 
 482 So.2d 1241, 1244 (Ala.1983).’
 

 “[Fortenberry v. State,]
 
 545 So.2d [129] 144 [ (Ala.1989) ]. Accord
 
 Bryant v. State,
 
 [951] So.2d [702], [732] (Ala.Crim.App.1999) (opinion on return to remand);
 
 Gavin v. State,
 
 891 So.2d 907, 995 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004);
 
 Stewart v. State,
 
 730 So.2d 1203, 1219 (Ala.Crim. App.1996), aff'd, 730 So.2d 1246 (Ala.1999).”
 

 930 So.2d at 568.
 

 The misstatements were not contained in the section of the sentencing order weighing the aggravating and the mitigating circumstances. The misstatements were contained in the section entitled “Findings of Fact at the Penalty Phase” and detailed the instructions that the court gave to the jury. However, the record shows that the court’s instructions at the penalty phase were correct. Based on these facts we decline to remand this case for the court to correct this error, which we are confident did not impact the circuit court’s decision in this case. Thus, any error was at most harmless. See
 
 Pilley.
 

 Brown also argues that the court failed to consider and find nonstatutory mitigating evidence concerning Brown’s good character and his history of substance abuse.
 

 The circuit court, after listing each statutory mitigating circumstance and finding that none applied, then considered nonstatutory mitigating circumstances.
 

 “At the sentencing phase before the jury, the defense presented testimony by the defendant’s mother, Lisa Brown, and defendant’s half sister Sherry Bog-ner Lawrence. Both testified that the defendant’s father drank heavily and that he verbally and physically abused women. The mother testified that she recalled him striking the defendant on one occasion.
 

 “The Court in considering the testimony of both family members, even in the light most favorable to the defendant, finds that this is a nonstatutory mitigating circumstance; however, the mitigating circumstance of an unpleasant home life was totally outweighed by the aggra
 
 *932
 
 vating circumstances as presented [by] the evidence in this case.
 

 “A stipulation was presented at the sentencing phase and was considered by the Court. The Defendant Michael Lee Brown testified in another court, wherein another defendant was convicted of capital murder. The defendant testified without any promise or reward or consideration. Having considered this stipulation the Court finds this is a non-mitigating circumstance; however, any mitigation was greatly outweighed by the evidence presented in this case.
 

 “After consideration of all of the matters that were presented to this Court, the testimony heard at trial and the sentencing hearing before the Court, both in mitigation and by aggravation, the pre-sentence investigation report, taking into consideration all other matters that were proffered before this Court as hereinabove stated in this order and disregarding pleas or references to the Court to consider this sentence on basis of passion or prejudice the Court does now find and is convinced beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances and the jury recommendation of eleven (11) to one (1) for death is the appropriate sentence.”
 

 (C.R. 199-200.) It is clear that the circuit court considered statutory mitigating circumstances and nonstatutory mitigating circumstances. “[T]he trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating.”
 
 Williams v. State,
 
 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
 

 Brown last argues that the circuit court separately weighed each mitigating circumstance against all of the aggravating circumstances. However, the order states that the court weighed all mitigating circumstances against all aggravating circumstances. Moreover, the circuit court correctly charged the jury on this issue. We do not agree with Brown’s assessment of the record in regards to this issue. Thus, we find no plain error.
 

 XXVII.
 

 Brown argues that the cumulative effect of all of the alleged errors requires that his conviction and death sentence be reversed.
 

 We have scrupulously reviewed the record and find no evidence that the cumulative effect of any of the indicated errors affected Brown’s substantial rights. See
 
 Ex parte Woods,
 
 789 So.2d 941 (Ala.2001).
 

 XXVIII.
 

 Last, as required by § 13A-5-53, Ala.Code 1975, we address the propriety of Brown’s conviction for capital murder and his sentence to death. Brown was indicted and convicted of murdering Betty Kirkpatrick during the course of committing a robbery and a burglary, offenses defined as capital by §§ 13A~5-40(a)(2) and (a)(4), Ala.Code 1975, an offense punishable by death.
 

 The record reflects that Brown’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(l), Ala. Code 1975.
 

 The circuit court found that the aggravating circumstances outweighed the mitigating circumstances and warranted that Brown be sentenced to death. The court stated, in part:
 

 “The court finds from the evidence three
 

 (3) aggravating circumstances were presented in this case. The first [ (1) ] ag
 
 *933
 
 gravating circumstance was that the capital offense was committed by the defendant after he had previously been convicted of a felony involving the use of threat of violence to a person pursuant to § 13A-5-49(2). The second (2) aggravating circumstance was that the capital offense was committed while the defendant was engaged in the commission of, or an attempt to commit robbery and that the capital offense was committed while the defendant was engaged in the commission of or attempt to commit a burglary, pursuant to § 13A-5-49(4) and the third (3) aggravating circumstance [was] that the capital felony was especially heinous, atrocious and cruel pursuant to § 13A-5^19(8).”
 

 The court found no statutory mitigating circumstances. As a nonstatutory mitigating circumstance the court found that Brown’s father drank and was physically abusive. The court also found as a non-statutory mitigating circumstance that Brown testified in an unrelated capital-murder trial without any reward or consideration. The circuit court’s findings are supported by the record.
 

 Section 13A-5-53(b)(2), Ala.Code 1975, provides that we must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Brown’s sentence of death. After an independent weighing we are convinced that death is the appropriate sentence.
 

 Section 13A-5-53(b)(3), Ala.Code 1975, provides that we must address whether Brown’s sentence of death was disproportionate to the penalties imposed in similar cases. Brown’s death sentence is neither. “In fact, two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder.”
 
 McWhorter v. State,
 
 781 So.2d 257, 330 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000), cert. denied, 532 U.S. 976 (2001). See, e.g.,
 
 Beckworth v. State,
 
 946 So.2d 490 (Ala.Crim.App.2005), cert. denied, 549 U.S. 1120, 127 S.Ct. 936, 166 L.Ed.2d 717 (2007) (burglary/murder);
 
 Walker v. State,
 
 932 So.2d 140 (Ala.Crim.App.2004) (burglary/murder);
 
 Wynn v. State,
 
 804 So.2d 1122 (Ala.Crim.App.2000), cert. denied, 804 So.2d 1152 (Ala.2001), cert. denied, 535 U.S. 972 (2002) (robbery/burglary/murder).
 

 Last, we have searched the record for any error that may have adversely affected Brown’s substantial rights and have found none. Rule 45A, Ala.R.App.P.
 

 Accordingly, Brown’s conviction and sentence to death are due to be, and are hereby, affirmed.
 

 AFFIRMED.
 

 BASCHAB, P.J., and McMILLAN, SHAW, and WELCH, JJ., concur.
 

 [1]
 

 . In Part XX of this opinion we find that the prior conviction for attempted rape was not property proven to be a violent offense; therefore, it could not be used to support the aggravating circumstance that Brown had previously been convicted of a felony involving the use of violence. See § 13A — 5—49(2), Ala.Code 1975. However, the State also presented evidence indicating that Brown had been convicted of a prior offense for robbery in the first degree and that this offense was a violent offense that would support the application of this aggravating circumstance.
 

 [2]
 

 . Excluding witnesses from the courtroom is referred to as "the rule." See Rule 9.3, Ala. R.Crim.P., and Rule 615, Ala.R.Evid. Here, Betty Kirkpatrick's son, Ricky Kirkpatrick, and his wife were exempted from the rule. Both discovered the victim’s body and testified at trial.
 

 [3]
 

 . Rule 19.3(b), Ala.R.Crim.P., states:
 

 “(b) Admonitions to Jurors. In all cases, the court shall admonish the jurors that they are not:
 

 “(1) To discuss among themselves any subject connected with the trial until the case is submitted to them for deliberations;
 

 "(2) To converse with anyone else on any subject connected with the trial, until they are discharged as jurors in the case;
 

 "(3) To knowingly expose themselves to outside comments or to news accounts of the proceedings, until they are discharged as jurors in the case; or
 

 "(4) To form or express any opinion on the case until it is submitted to them for deliberation.
 

 “If the jurors are permitted to separate, they may also be admonished not to view the place where the offense was allegedly committed.”
 

 [4]
 

 . Rule 12.1, Ala.R.Crim.P., states, in pertinent part:
 

 “(c)
 
 Qualifying the Venire.
 
 On the opening day of the term, or such other day as the venire shall have been summoned to appear, the judge presiding shall proceed to organize the court, by:
 

 “(2) Administering or causing to be administered to the jurors the following oath as required by law....”
 

 [5]
 

 . To protect the anonymity of these jurors we are using their initials.
 

 [6]
 

 . Section 12-16-63 was amended effective November 1, 2005. The amendment substan-lially revised diis section.
 

 [7]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [8]
 

 . Moreover, we have held that the failure to name the specific DNA test used goes to the weight and not the admissibility of the evidence. See
 
 Broadnax v. State,
 
 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002).
 

 [9]
 

 . The United States Supreme Court in
 
 Bruton v. United States,
 
 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), held that the admission of a codefendant's statement at trial violates the defendant’s Sixth Amendment right to confrontation if (1) the statement incriminates the defendant, and (2) the codefen-dant chooses not to testify. There was no indication in this record that Smith was ever charged with any offenses related to Kirkpatrick's murder.
 

 [10]
 

 . Brown also argues that the prosecutor improperly stated the law on the unlawfully-remains element of burglary.
 

 [11]
 

 . Brown also argues that he was never put on notice of the charge of stealing the victim’s automobile. Brown was neither indicted nor convicted for that offense. " ' “The charge upon which the conviction rests is the only charge that is subject to appellate review.”
 
 Flowers v. State,
 
 922 So.2d 938, 957 (Ala.Crim.App.2005) quoting
 
 Allen v. State,
 
 683 So.2d 38, 41 (Ala.Crim.App.1996), quoting in turn
 
 McCain v. State,
 
 611 So.2d 1123, 1124 (Ala.Crim.App.1992).
 

 [12]
 

 . Brown also attacks the Supreme Court’s decision in
 
 Ex parte Waldrop,
 
 859 So.2d 1181 (Ala.2002). However, we are bound by the decisions of the Alabama Supreme Court and have no authority to modify or reverse those decisions. See § 12-3-16, Ala.Code 1975.